## APPEAL OF PADUCAH & ILLINOIS RAILROAD CO.

Docket No. 3028.   Submitted July 15, 1925.   Decided October 26, 1925.

The taxpayer was organized by a number of railroad companies to provide bridge facilities across the Ohio River, the several companies agreeing to establish rates or otherwise furnish funds in the proportion of their respective use of the facilities to cover operating expenses, interest, taxes and sinking fund charges, the railroads to receive preferred stock for all contributions devoted to sinking funds or retirement of bonds. *Held*, that the payments applying on sinking funds and retirement of bonds constituted capital contributions and not income subject to taxation.

92208—26——64

*Thomas J. Lawless, Esq.*, for the taxpayer.
*Arthur H. Fast, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

The taxpayer is a Kentucky corporation, with its principal offices in Chicago, Ill.

The taxpayer was caused to be incorporated in February, 1910, by the Chicago, Burlington & Quincy Railroad Co., and the Nashville, Chattanooga & St. Louis Railway, hereinafter referred to, together with the Illinois Central Railroad Co., as the railroad companies, for the purpose of constructing a bridge over the Ohio River with railroad tracks thereon, leading from Metropolis, Ill., to Paducah, Ky. Actual building operations were not undertaken until 1914, and the property was opened for commercial traffic January 1, 1918. The capital stock of the taxpayer was issued to the first-named railroad companies in the amount of $10,000, in equal proportions. Effective September 1, 1920, the first-named railroad companies each sold to the Illinois Central Railroad Co. sufficient of their holdings of the capital stock of the taxpayer to make that company an equal one-third owner with the said two first companies of the capital stock of the taxpayer. Bonds of the taxpayer were issued in the sum of $5,000,000, out of the proceeds of which the property of the taxpayer was constructed. The payment of principal and interest of these bonds and sinking fund payments required to be made by the terms of taxpayer's mortgage securing the bonds was expressly guaranteed by the first two named railroad companies by endorsement on the bonds.

Prior to the construction of taxpayer's bridge, traffic was transported over the Ohio River by ferries, owned and operated by the railroad companies, the revenues and expenses of which entered into their respective income accounts. The taxpayer corporation was organized and its property was caused to be constructed to take the place of said ferries.

On September 1, 1914, a contract was entered into between the taxpayer corporation as party of the first part, the two original

railroad companies as parties of the second part, and the Union Trust Co. (trustee under the taxpayer's mortgage) as party of the third part, the portions of which, material to this inquiry, are contained in sections 1, 2, and 5 thereof, reading in full as follows:

Section 1. Each Railway Company hereby covenants and agrees with the Bridge Company, with the Trustee Company, and with the other Railway Company, as follows, viz:

The Bridge Company, shall, from time to time, fix, publish and collect, reasonable and lawful tolls, charges and compensation for the transportation of freight and passengers and other property over said bridge and railroad and for the use of said facilities by the Railway Companies, and in the event that it becomes impracticable for any reason, for said Bridge Company so to do and the Railway Companies or either of them, may lawfully publish and collect said tolls and charges, then the Railway Companies or either of them shall publish, collect and pay the same over to the Bridge Company.

The Bridge Company covenants and agrees to apply said revenue and pay said tolls, rentals, charges and compensation, received by it, in the following order, to-wit:

1st. To the cost and expense incurred by the Bridge Company during each month in the operation, maintenance and repair of the facilities (after applying to such renewal and repairs any sums which may have been received on account of insurance) and including all salaries, wages, supplies, insurance and rentals and all other expenses whatsoever during such month not otherwise herein expressly provided for.

2nd. To the payment of all taxes, rates, benefits, assessments or other Governmental charges of any kind, upon or on account of said bridge, railroad and facilities.

3rd. To the payment of the interest as it may become due and payable, upon any bonds that shall have been issued and that may be outstanding under said First Mortgage of the Bridge Company.

4th. To any sinking fund or premium payment payable by said Bridge Company under the terms of its said First Mortgage.

5th. To the payment of dividends on any preferred stock, issued as in section 5 of the Article provided.

In the event that the revenue received by the Bridge Company from said tolls, charges, rentals and compensation, shall at any time be insufficient to promptly make the payment or any of them, aforesaid, then the Railway Companies shall each pay to the Bridge Company, one-half of the remainder necessary and at the time specified, to enable it to make the payments above mentioned.

Section 2. On the day when any of said First Mortgage Bonds of the Bridge Company shall become due and payable, either by their terms or by acceleration of payment as provided in the said bonds or in said mortgage, each Railway Company agrees to pay to the Bridge Company, a sum equal to one-half of the principal of said First Mortgage Bonds payable on such date.

Section 5. Whenever the Railway Companies shall make any payments to the Bridge Company pursuant to Section 2 of this Article on account of the principal of said First Mortgage Bonds of the Bridge Company, or whenever any payment is made to the sinking fund either by the Bridge Company out of its income or by the Railway Companies pursuant to Section 1 of this

Article, then the Bridge Company shall issue and shall deliver to the Railway Companies preferred stock of the Bridge Company to an amount at par equal to the par value of the bonds purchased for the sinking fund in any year. Such preferred stock shall be entitled to receive dividends payable semi-annually at the rate of and limited to 4½ per cent per annum, before any dividends shall be declared on the common stock, and said dividends shall be cumulative; and on the dissolution of the Bridge Company, whether voluntary or otherwise, the holders of the preferred stock shall be entitled to have their shares redeemed at par before any distribution of any part of the assets of the company shall be made to the holders of the common stock. The preferred stock shall not be entitled to a vote.

On July 1, 1915, the parties entered into a supplemental agreement in respect of the foregoing, increasing the amount of mortgage bonds which might be issued by the taxpayer, but in other respects not changing the relationship of the parties.

On January 10, 1923, the Illinois Central Railroad Co. was made a party as of September 1, 1920, to all the agreements heretofore and hereinafter mentioned, but not otherwise affecting the matters here under consideration.

On July 1, 1915, the original railroad companies entered into an agreement, to which the Illinois Central was made a party, by the above-mentioned contract as of September 1, 1920, providing for the distribution of charges and for the distribution of preferred stock, the material portions of which are contained in Paragraphs I, II, III, IV, and V, which provisions are in full as follows:

I. Statements shall be prepared each calendar month by the Bridge Company, and a copy thereof delivered to each of the parties hereto, showing the amount of revenue received by it from its tolls, rentals and compensation for the preceding calendar month, and also showing what proportion thereof has been contributed respectively from the revenues of each of the parties hereto. A similar statement for each fiscal year shall be furnished by the Bridge Company to each of the parties hereto.

II. In the event that the revenue received by the Bridge Company for any calendar month from its tolls, rental, charges and compensation shall be insufficient to make the payments chargeable to such calendar month provided for in said section 1 of Article II of said agreement of September 1, 1914, as modified by Supplemental Agreement of this date, the deficit shall be paid by the parties to this agreement in the same proportion as it may be ascertained under the preceding paragraph that such revenue of the Bridge Company shall have been contributed to for such calendar month from the revenues of each of the parties hereto respectively. Such payments so made by each of the parties hereto shall constitute a floating indebtedness of the Bridge Company out of its future revenues before there shall be any distribution of surplus as hereinafter provided.

III. In the event, at the termination of any fiscal year, there shall be a surplus from the operations of the Bridge Company, after making the payments provided for in said section 1, of Article II of the agreement of September 1, 1914, as modified by Supplemental Agreement of this date, and after paying any previous deficits as provided for in paragraph II of this agreement, such surplus shall be divided between the parties hereto in the pro-

portion which each of them has contributed from its revenues to the revenues of the Bridge Company, as ascertained by the statements provided for in paragraph I hereof.

IV. When any preferred stock shall be issued by the Bridge Company under section 5 of Article II of said agreement of September 1, 1914, as modified by Supplemental Agreement of this date, either on account of payments made to the sinking fund by the Bridge Company out of its revenues from operation, or out of sums paid by the parties hereto, such preferred stock shall be issued and delivered to each of the Railway Companies parties hereto, in the same proportion which each of them has contributed from its revenues to the revenues of the Bridge Company for the fiscal year during which such payments to the sinking fund have been made as ascertained by the statements provided for in paragraph I hereof.

V. The term "deficit" when used in this agreement, shall signify the amount by which the revenue received by the Bridge Company is insufficient to make the payment provided for in section 1 of Article II of the agreement of September 1, 1914, as modified by the Supplemental Agreement of this date, and the term "surplus" whenever it appears, shall signify the amount of revenue remaining after said payments shall have been deducted therefrom.

For the taxable years here in question the taxpayer rendered statements to the railroad companies, as provided in the above agreements, and payments were duly made in accordance therewith. During the year 1920, either directly as a part of the tolls fixed by the taxpayer or by contributions to the deficit of the taxpayer, as shown by such statements, the said railroad companies contributed $95,238 for the purposes of the sinking fund above mentioned, and in the year 1921, under like circumstances, contributed $121,550. Preferred stock to the amounts above set forth were, by the contracts above set forth, required to be issued to the railroad companies for the amount of the above advances, respectively, and in the proportions of their contributions as set forth in the statements rendered them by the taxpayer.

The taxpayer made returns of income to the collector of internal revenue for its district, showing thereon no net income and omitting from the said returns the above-mentioned amounts of $95,238 and $121,550, respectively. The Commissioner, in examining returns of the taxpayer, added to income the above-mentioned amounts and computed the deficiency here in question as a result of the said additions.

### DECISION.

The deficiencies determined by the Commissioner are disallowed.

### OPINION.

JAMES: The taxpayer alleges error on the part of the Commissioner, first, on the ground that the amounts above set forth were

contributed by the railroad companies as capital to the taxpayer and did not constitute income; and, second, that the taxpayer is a mere joint facility and agency of the railroad companies, and as such is not a separate entity which can be the receiver of income or taxable under the revenue laws. On the latter point we do not agree with the contention of the taxpayer, and must hold that it is a separate taxable entity, distinct from the railroad companies, capable of receiving income upon its own account, and subject to taxes thereon. *Hamilton* v. *Kentucky & Indiana Terminal R. R. Co.*, 289 Fed. 20; *Boston Terminal Co.* v. *Gill*, 246 Fed. 664; *Houston Belt & Terminal Ry. Co.* v. *United States*, 250 Fed. 1. The principal consideration is whether the taxpayer was in receipt of income or capital contributions from the railroad companies to the extent that either its funds received in the first instance as tolls or its funds received as supplemental contributions were used for the purpose of retiring its funded debt. On this point we believe the position of the taxpayer is correct.

In effect, the railroad companies agreed among themselves, as set forth in the above findings of fact, to construct the bridge over the Ohio River and to create for that purpose the taxpayer corporation, and to share the cost of that facility in the manner laid down in the agreements. Briefly, charges were to be made for the services rendered in amounts deemed sufficient to pay all of the expenses of the taxpayer and in addition to retire its indebtedness at maturity. In the first instance, bills were rendered monthly upon a traffic basis, but if the amounts collected under these bills were insufficient to meet the charges of the taxpayer, supplemental bills were rendered for each of the several months, making up the deficits and calling for contributions by the railroad companies in the proportions of their original payments to the taxpayer. To the extent that the taxpayer's funds derived either under the original or the secondary bills were devoted to the retirement of bonds, the railroad companies were to receive preferred stock in the exact amount of their contributions used for that purpose. This was in accordance with the contract entered into July 1, 1915, by the two original participating railroad companies, and after September 1, 1920, participated in by the Illinois Central.

From the beginning, the funds so contributed by the railroad companies were earmarked partly for the ordinary expenses of the taxpayer and partly for its capital requirements. In so far as the contributions were used or to be used for ordinary expenses, interest, taxes, and dividends, there can be no question that the railroad companies were making payments for services rendered by the taxpayer, which constituted expenses to themselves and income to the

taxpayer. To the extent, however, that their contributions were from the beginning required and, under the contract of July 1, 1915, were contemplated to be used for the retirement of debt and offset by preferred stock issued or to be issued to the railroad companies, the contributions were not expenses of the railroad companies, and were not income to the taxpayer. They were, on the one hand, investments of capital, and, on the other, receipts of capital for which stock was required to be issued. A liability on account of bonds or for sinking fund payments was translated into a liability on account of preferred stock. So far as this taxpayer was concerned, there was no substantial change on its balance sheet, and this becomes instantly clear when it is realized that at no time did it have, under the procedure set forth in the contracts, any income which could be converted to surplus or utilized for the payment of dividends, except in so far as such contributions were required to pay dividends on preferred stock issued in conformity with the contract. Any surplus allocable to such a use would be, of course, income to the taxpayer, but no such surplus was actually created during the taxable years in question, so far as is indicated by any evidence now before the Board.

We are not unmindful of the decisions cited by the Commissioner—namely, *Houston Belt & Terminal Ry. Co.* v. *United States*, 250 Fed. 1; *Northern R. R. Co.* v. *Lowe*, 250 Fed. 856; *Boston Terminal Co.* v. *Gill*, 246 Fed. 664; *Blalock* v. *Georgia Ry. & Electric Co.*, 246 Fed. 387; *Anderson* v. *Morris & Essex R. R. Co.*, 216 Fed. 83; and *Rensselaer & Saratoga R. R. Co.* v. *Irwin*, 249 Fed. 726. None of these decisions, however, are pertinent to the question here at issue. They deal solely with the proposition to which reference was made briefly at the beginning of this opinion. Nor do we overlook the argument made by the Commissioner that the payments on account of preferred stock were in effect stock dividends. Had the contract provided for the distribution of preferred stock not upon the basis of the payments made for the use of the taxpayer's facilities, but upon the basis of common stock holdings, there would be much force in the Commissioner's suggestion. As set forth above, however, in the findings of fact, this was not the case, and the funds contributed by the railroad companies were offset by preferred stock issued or required to be issued in the exact amounts contributed by each of the several railroad companies. Under these circumstances, the funds never reached the stage of surplus subject to distribution then or at a future date in the form of dividends—either cash or stock. From the beginning the funds so paid represented contributions by the railroad companies, for which they had an absolute right to the issuance to them of pre-

ferred stock. We are also aware, as noted by the Commissioner in his brief, that no competent evidence was offered that preferred stock ever was actually issued to the railroad companies, and we have made no finding of fact with reference thereto. As we view the case, whether stock was actually issued at the time is immaterial. The railroad companies from the moment of their respective payments were entitled under their contracts to an accounting as to the disposition made of the funds so paid and to preferred stock in respect of their capital contributions. The stock was issuable on demand if not actually issued. Under these circumstances, the deficiency determined by the Commissioner must be disallowed.