106 T.C. No. 21

UNITED STATES TAX COURT

THE BOARD OF TRADE OF THE CITY OF CHICAGO AND SUBSIDIARIES,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8202-93.                          Filed May 29, 1996.

Petitioner (P) is a taxable membership corporation
that operates a futures exchange.  When a membership on
the exchange is transferred, the transferee must pay P
a transfer fee, which, under P's bylaws, is to be used
to "purchase, retire or redeem the indebtedness
encumbering the Board of Trade Building", which houses
P's trading floor and substantial office space leased
to third-party tenants.  Held, the transfer fees are
nontaxable contributions to capital, rather than
taxable payments for services, because the transferees
pay the fees with an investment motive, as evidenced by
(1) the earmarking of the fees for reduction of P's
mortgage indebtedness, (2) the resulting increase in
the members' equity in P, and (3) the members'
opportunity to profit from their investment in P
because of the lack of restrictions on the
transferability of their membership interests.

George B. Javaras, Barbara M. Angus, Richard E. Peterson, and Raymond P. Wexler for petitioner.

Joseph T. Ferrick, for respondent.

BEGHE, Judge:  Respondent determined deficiencies in petitioner's Federal income tax for the years 1988, 1989, and 1990 in the amounts of $108,859, $113,473, and $65,051, respectively.

The deficiencies arise from respondent's inclusion in petitioner's gross income of membership transfer fees.  The sole issue is whether the membership transfer fees paid to petitioner during 1988, 1989, and 1990 are contributions to capital or payments for services.  We hold the transfer fees to be excluded from gross income as contributions to capital.

FINDINGS OF FACT

The parties have stipulated some facts, and the stipulation of facts and the attached exhibits are incorporated in this opinion.  At all relevant times, petitioner maintained its principal place of business in Chicago, Illinois.

Petitioner, the Board of Trade of the City of Chicago (commonly referred to as the CBOT), is a taxable membership corporation organized in 1859 under a special act of the Illinois

legislature. Petitioner's principal business is the operation of a futures exchange. Petitioner owns and manages the commercial office building (CBOT building) that houses its exchange facilities. The bulk of the space in the CBOT building, approximately 80-85 percent, is leased to third-party tenants.

The CBOT building is the largest asset shown on petitioner's balance sheet. Petitioner's management believes that the current fair market value of the CBOT building is between $350 and $400 million. The CBOT building consists of the original landmark building constructed in the 1930's, a new trading floor that petitioner constructed in the early 1970's, and an adjacent 22-story commercial building that petitioner constructed in the early 1980's at a cost of between $110 and $120 million. Petitioner's borrowings to finance these acquisitions are represented by one consolidated and extended mortgage debt secured by the CBOT building.

During the years in issue, the mortgage debt encumbering the CBOT building represented petitioner's single largest liability. The amounts of the mortgage debt as of December 31, 1988, 1989, and 1990 were $33,315,792, $30,695,564, and $27,793,779, respectively. Petitioner made payments of principal and interest on the mortgage debt in the total amount of $5,914,269 in each of the years in issue.

Ownership of petitioner is vested in its members and is represented by five classes of transferable memberships: Full memberships, associate memberships, Government Instruments Market (GIM) memberships, Commodity Options Market (COM) memberships, and Index, Debt and Energy Market (IDEM) memberships.

Each class of membership carries specified voting rights, dissolution rights, and trading privileges. The most comprehensive membership, a full membership, has trading privileges on all markets on the CBOT, a full share on liquidation, and one vote on all matters voted on by CBOT members. The most restricted membership, an IDEM membership, has trading privileges only on the Index, Debt and Energy market, a one-half percent of one share on liquidation and voting rights to elect members of an IDEM liaison committee to the board of directors of the CBOT. The following chart shows the numbers of different memberships during the years in issue and summarizes the rights and privileges of each class:

| Class of Member-ship | Numbers of memberships as of: 1/1/88 12/31/88 12/31/89 12/31/90 | | | | Trading Privileges | Voting Rights | Dissol-ution Rights | Transfer fee |
|---|---|---|---|---|---|---|---|---|
| FULL | 1402 | 1402 | 1402 | 1402 | All futures contracts and full trading privileges on the CBOT and CBOE ** | 1 vote on all matters voted on by the owners of CBOT member-ships | 1 share | $1,000 |
| ASSOCIATE | 713 | 722 | 739 | 748 | All futures contracts except agri-cultural and associated markets | 1/6 of 1 vote on all matters voted on by the owners of CBOT member-ships | 1/6 of 1 share | $1,000 |
| GIM | 1374* | 1393* | 1491* 1493* | | Only Government Instrument Market | Voting rights to elect a GIM liaison commit-tee | 11% of 1 share | $350 |
| COM | * | * | * | * | Only Commodity Options Market | Voting rights to elect a COM liaison commit-tee | 1/2% of 1 share | $350 |
| IDEM | * | * | * | * | Only Index, Debt and Energy Market | Voting rights to elect an IDEM liaison commit-tee | 1/2% of 1 share | $0 |

* These numbers are the totals of the combined GIM, COM and IDEM memberships on the dates indicated. There is no evidence in the record, other than records of the numbers of transfers during a year of each class of membership (see infra p. 6) of the specific numbers of each of these three classes of membership on any of the specified dates.

** The Chicago Board of Option Exchange (CBOE) is an organization separate from the CBOT.

The bundles of rights inherent in CBOT memberships are divisible into two components:  the ownership or equity component and the trading privilege component.  Although all members of a class of membership have equal rights and privileges, approximately 35 to 40 percent of petitioner's members do not exercise their trading privileges.  The owner of a membership is entitled to lease or delegate the trading privileges attributable to the membership.  A member who leases or delegates trading privileges retains the voting and dissolution rights attributable to the membership.  Included in the 35 to 40 percent of members who do not exercise their trading privileges are approximately 16 percent of petitioner's members who neither exercise their trading privileges nor lease or delegate them to third parties.

Petitioner's members may freely sell or transfer their memberships pursuant to petitioner's rules and procedures described infra pp. 10-11.  During the taxable years 1988 through 1990, 494 full memberships, 334 associate memberships, 25 GIM memberships, 487 COM memberships, and 432 IDEM memberships were sold or otherwise transferred.  At the time of trial, spring 1994, the fair market value of a full membership was approximately $575,000.  When a membership is transferred, the

transferee, in accordance with petitioner's rule 243,[1] must pay a transfer fee.

Petitioner's rule 243 is separated into three sentences. The first states that "No transfer of a membership may be consummated unless the transferee pays to the Association a transfer fee".[2] The transfer fee applies not only to sales of memberships but also to transfers of memberships without consideration, such as intrafamily transfers and intrafirm transfers from the name of an owner firm's qualified partner or employee to another qualified individual in the firm. Petitioner's management regards the transfer fees as necessary for applicants to understand and recognize that they are the owners of the association.

The second sentence of rule 243 states that "The amount of [the transfer fee] is established from time to time by the Board of Directors."[3] The amount of the transfer fee depends on the class of membership transferred. During the taxable years 1988 through 1990, the transfer fees set by petitioner's board of

---

[1] Rule 243 is part of the bylaws of the CBOT, adopted and amended by the owners of CBOT memberships.

[2] In 1925, the CBOT members adopted the predecessor of rule 243, then known as rule 111. Rule 111 was amended in 1937 to specify that the purchaser of a membership would pay the transfer fee. Prior thereto, rule 111 specified that the seller would pay the fee.

[3] In 1970, rule 111 was amended to provide that the amount of the transfer fee would be set by the board of directors.

directors were $1,000 for full and associate memberships, $350 for GIM and COM memberships, and no fee for an IDEM membership. In the early 1970's petitioner's board of directors increased the transfer fees for full and associate memberships from $500 to $750. During this same period, petitioner constructed the new trading floor. In 1978, petitioner's board of directors increased the transfer fee for full and associate memberships from $750 to $1,000, effective in 1979 when petitioner began construction of the adjacent 22-story commercial building.

The final sentence of rule 243 states that "The transfer fee so collected shall be used to purchase, retire or redeem the indebtedness encumbering the Board of Trade Building."[4] In 1988, 1989, and 1990, petitioner received transfer fees totaling $319,800, $333,350, and $345,050, respectively. The amount of

---

[4] In 1937, petitioner and Chicago Board of Trade Safe Deposit Co. (a corporation affiliated with petitioner, which owned and leased the CBOT building to petitioner because at that time petitioner was not permitted under Illinois law to own property with a value in excess of $200,000), had an opportunity to refinance the CBOT building at a lower interest rate and on more favorable payment terms, provided that the outstanding mortgage principal balance was reduced by $1,218,000. In order to raise capital needed to reduce the mortgage principal, petitioner made a special assessment against all members, and rule 111 was amended to require that all transfer fees be used for the purchase, retirement, or reduction of the mortgage obligation. In 1947, after repeal of the property ownership prohibition, petitioner acquired its building from Chicago Board of Trade Safe Deposit Co., and rule 111 was amended to reflect the ownership change of the CBOT building. As amended, rule 111 required that all transfer fees be used for the purchase, retirement, or redemption of the indebtedness encumbering the CBOT building.

mortgage principal payments made by petitioner in each of the taxable years substantially exceeded the amount of the transfer fees collected by petitioner during those years.  For example, the transfer fees received in 1989 and 1990, respectively, of $333,350 and $345,050, compare with the mortgage principal payments of $2,620,288 and $2,901,785 during those respective years.

For accounting purposes, each transfer fee received by petitioner is recorded as "Restricted Capital" in one or the other of two capital accounts.  Petitioner uses account No. 2810 (Capital-Membership Transfers) for transfer fees collected on transfers of full and associate memberships, and account No. 2808 (Capital-Interest Transfers) for transfer fees collected on transfers of GIM and COM memberships.  After a mortgage principal payment is made, an equivalent amount of the transfer fees in accounts Nos. 2808 and 2810 is considered by petitioner as "Unrestricted Capital".  From time to time, the balances in account Nos. 2808 and 2810 are transferred to account No. 2850 (Retained Earnings).  These accounting transfers are not made until the amount of mortgage principal paid by petitioner exceeds the balances in accounts Nos. 2808 and 2810.

For financial reporting purposes, the transfer fees received by petitioner during the year are reflected in the Statements of Consolidated Members' Equity as capital contributions of new

members.  Since 1937, petitioner has so treated the transfer fees received.  The transfer fees received by petitioner in 1988 and 1989 were the only amounts reflected in the Statements of Consolidated Member's Equity in petitioner's financial statements as capital contributions of new members.  The amount of capital contributions of new members reflected on the 1990 financial statements is the sum of the amount of transfer fees received in 1990 and the amounts received by petitioner on sales of new participation interests to members in 1990.[5]  Petitioner showed, on Schedule L of Form 1120, U.S. Corporation Income Tax Return, all transfer fees collected during the taxable years 1988 through 1990 as contributions to capital.

A member who wishes to sell a membership submits to petitioner an offer to sell, which includes an offer price. Petitioner posts all offers to sell and bids to purchase on the bulletin board of the CBOT.  A sale is effected when there is a match between an offer and a bid.

Petitioner's Member Services Department collects the transfer fees in connection with the transfers of memberships.

---

[5]  Petitioner collected $345,050 in transfer fees in 1990. The capital contributions received from new members during 1990 was $474,364; the balance of $129,314 was the proceeds of sales of new memberships received by petitioner in 1990.  The parties' supplemental stipulation of facts states that transfer fees received by petitioner in 1988 and 1989 were the only capital contributions made in those years, notwithstanding that there were increases in the number of memberships in those years, as well as in 1990.

When a membership is transferred, petitioner:  (1) Maintains and publishes a list of bids to purchase and offers to sell; (2) receives and holds bid purchase money and transfer fees while bids to purchase are pending; (3) receives and holds the authorization of sale submitted by a prospective seller; (4) notifies the buyer and seller whenever a bid and offer match; (5) withholds from the tendered purchase price an amount necessary to pay any outstanding exchange fees or fines of the seller, as well as any trading related debts or membership financing of the seller owed to other members or clearing firms; (6) remits membership sale proceeds to all parties who submitted claims against the seller for repayment of outstanding debt, that have been "allowed" by the exchange; and (7) keeps records of all membership transfers, including intrafirm and intrafamily transfers, and membership exchanges.

Within 5 business days of acquiring the membership (unless the application was submitted and approved prior to the acquisition), the purchaser must submit an application for membership to petitioner.  As part of the application process, prospective members are given a copy of petitioner's rules and they are tested on their knowledge of these rules.  If the new owner of a membership fails to submit an application, is not elected to membership, or withdraws the application, petitioner's regulations require the new owner to sell the acquired membership

within a 30-day period. If the membership is not sold within the 30-day period, petitioner auctions the membership and remits the proceeds to the seller. On all these compulsory resales of memberships, petitioner retains the transfer fee that was paid by the original purchaser and also collects a transfer fee from the new purchaser on the resale.

In addition to collecting the transfer fees, the Member Services Department collects fees from applicants, members, and others in the following five categories: (I) Application fees, (ii) delegate fees, (iii) registration fees, (iv) badge fees, and (v) miscellaneous fees.

Petitioner's Member Services Department collects application fees in connection with the processing of membership applications. From time to time, petitioner's board of directors reconsiders and revises the amount of the application fee. Increases in the application fee have been related to increases in the cost of operating the CBOT Member Services Department. The application fee for all first time applicants for any type of membership was $750 from January 1, 1988, through December 31, 1989, and $1,000 from January 1, 1990, through December 31, 1990. The application fee must be paid, regardless of whether the purchaser already owns another membership. However, a person who already owns a CBOT membership submits a short-form application in connection with the acquisition of an additional membership.

During the years in issue, the application fee for a short-form application was $300.

The Member Services Department collects a delegate fee whenever a member wishes to lease the trading rights associated with his membership. The delegate-lessee must submit a delegate application and pay a nonrefundable delegate fee. Every firm trading on the CBOT must be registered with petitioner and pay a registration fee in connection with its registration. All individuals who are required to wear a badge on the trading floor must pay the badge fee to petitioner.[6] The Member Services Department collects various miscellaneous fees, including fees for fingerprinting, certificates, and coat room services.

For financial reporting and tax purposes, petitioner reports the application, delegate, registration, badge, and miscellaneous fees as revenues included in gross income. For 1988, 1989, and 1990, these revenues equaled $1,167,750, $1,115,021 and $2,718,419, respectively.[7] For each of the taxable years 1988

---

[6] The badge fees were collected by another department of the CBOT prior to 1990.

[7] The amounts of these other fees and expenses of the Member Services Department during the taxable years were:

| Type of fee | 1988 | 1989 | 1990 |
|---|---|---|---|
| Application fees | $720,425 | $644,550 | $766,825 |
| Delegate fees | 367,800 | 391,800 | 811,200 |
| Registration fees | 75,790 | 72,210 | 74,400 |
| Miscellaneous fees | 3,735 | 6,461 | 83,609 |
| Badge fees | 0 | 0 | 982,385 |
| **Totals** | 1,167,750 | 1,115,021 | 2,718,419 |

(continued...)

through 1990, the revenues of the Member Services Department
exceeded its expenses.

The bulk of petitioner's revenues is derived from
transaction fees paid for each trade executed on the exchange and
from rents for the lease of space in the CBOT building.  For the
years in issue, petitioner received the following revenues from
these sources:

| Year | Transaction Fees | Building Rents |
|------|------------------|----------------|
| 1988 | $42,375,000 | $22,558,000 |
| 1989 | 41,489,000 | 24,644,000 |
| 1990 | 43,688,000 | 24,655,000 |

All funds received by petitioner, including transfer fees, are
commingled in one bank account.

During 1988 and 1989 and prior years, CBOT members had paid
quarterly dues assessed by the CBOT board of directors to help
cover operating expenses.  However, petitioner waived membership
dues for every year from 1990[8] through the time of trial,

_____

[7](...continued)

| Expenses | 719,423 | 807,749 | 1,074,709 |

[8]  Petitioner's 1990 financial statement states that
membership dues were waived in each quarter of 1990.  However,
the 1990 statement of consolidated income member's dues column
reports total dues of $888,000.

primarily because of the surplus in petitioner's operating revenues.

OPINION

The issue for decision is whether petitioner must include in gross income the transfer fees that prospective members pay in connection with their acquisitions of memberships. Petitioner characterizes the transfer fees as contributions to capital and principally relies on section 118[9] for the proposition that contributions to capital are not included in the gross income of a corporation. Respondent characterizes the transfer fees as taxable payments for services that do not qualify as contributions to capital.

Section 118(a) states that "In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer." Congress enacted section 118 to codify[10] the preexisting concept of a capital contribution by a nonshareholder, Brown Shoe Co. v. Commissioner, 339 U.S. 583, 591 (1950), or shareholder, 874 Park Ave. Corp. v. Commissioner, 23

---

[9] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

[10] Sec. 118 was a new provision of the 1954 Code. The House Ways and Means Committee report described the section as merely stating the existing law as developed through administrative and court decisions. H. Rept. 1337, 83d Cong., 2d Sess. A38 (1954).

B.T.A. 400 (1931); Paducah & Ill. R.R. v. Commissioner, 2 B.T.A. 1001 (1925); G.C.M. 4015, VII-1 C.B. 120 (1928), revoked by Rev. Rul. 77-354, 1977-2 C.B. 50.

Respondent postulates that, under section 1.118-1, Income Tax Regs., a payment cannot be a contribution to capital unless it is voluntary, pro rata, and required by the corporation to conduct its business, as described by the somewhat circumscribed example in the regulations.[11] Respondent argues that the transfer fees are not contributions to capital because they are not needed by petitioner to conduct its business, and are neither voluntary nor pro rata.

That the transfer fees are neither voluntary nor pro rata is not dispositive of whether the fees are capital contributions. Mandatory payments to a corporation may qualify as capital contributions, Concord Village, Inc. v. Commissioner, 65 T.C.

---

[11] Sec. 1.118-1. Contributions to the capital of a corporation.--

In the case of a corporation, section 118 provides an exclusion from gross income with respect to any contribution of money or property to the capital of the taxpayer. Thus, if a corporation requires additional funds for conducting its business and obtains such funds through voluntary pro rata payments by its shareholders, the amounts so received being credited to its surplus account or to a special account, such amounts do not constitute income, although there is no increase in the outstanding shares of stock in the corporation. * * * However, the exclusion does not apply to any money or property transferred to the corporation in consideration for goods or services rendered * * *. [Emphasis added.]

142 (1975); Lake Petersburg Association v. Commissioner, T.C. Memo. 1974-55, and the Supreme Court has observed that a payment to a corporation can be a capital contribution even if some shareholders contribute less than others or nothing at all, Commissioner v. Fink, 483 U.S. 89 (1987); see also Sackstein v. Commissioner, 14 T.C. 566 (1950). These cases confirm that the language of the regulation is merely illustrative and does not exhaust the definition of a capital contribution.

Nor does petitioner's lack of need for the transfer fees in order to conduct its business compel the conclusion that they are not contributions to capital. The corporation's need is only another element of the illustrative language of the regulation. A payment can be a contribution to capital where it is not needed by the corporation for the conduct of its business. See Cambridge Apartment Bldg. Corp. v. Commissioner, 44 B.T.A. 617 (1941) (holding shareholder payments in excess of operating requirements to be contributions to capital when used to retire bonded indebtedness).

The correct characterization of a shareholder payment to a corporation depends on the capacities in which the shareholder and the corporation deal with each other in making and receiving the payment. Cf. sec. 1.301-1(c), Income Tax Regs. (limiting dividend treatment to amounts paid by a corporation to a shareholder in his capacity as such), sec. 1.311-1(e)(1), Income

Tax Regs. (applying sec. 311[12] to distributions to shareholders made by reason of the corporation-shareholder relationship and not to transactions between a corporation and a shareholder in his capacity as debtor, creditor, employee, or vendee, where the fact that the distributee is a shareholder is incidental to the transaction). Here the characterization issue is complicated by the fact that the payors of the transfer fees become both equity owners of petitioner and its primary customers, and that, by becoming members, the payors of the transfer fees become entitled to use the trading facilities of the exchange.

CBOT members' use of petitioner's trading facilities does not prevent the transfer fees from being contributions to capital. A payment by a member-owner of an organization can be a contribution to capital even where the member-owners receive goods or services from the corporation. See Concord Village, Inc. v. Commissioner, supra (payments by members to a cooperative housing corporation to fund a replacement reserve held to be contributions to capital, even though members also leased property from the corporation); Minnequa Univ. Club v. Commissioner, T.C. Memo. 1971-305 (payments by members to an

_____

[12] The general nonrecognition rule of sec. 311(a), as interpreted by this regulation, was repealed as part of the fairly comprehensive repeal by the Tax Reform Act of 1986, Pub.L. 99-514, 100 Stat. 2085, of the statutory enactments of General Utils. & Operating Co. v. Helvering, 296 U.S. 200 (1935). The regulation was removed from the regulations in 1993 by T.D. 8474, 1993-1 C.B. 242.

incorporated non-stock social club to repair and improve the club's building held to be capital contributions even though the club's principal business was providing services to its members); Lake Forest, Inc. v. Commissioner, T.C. Memo. 1963-39 (payments by members to a cooperative housing corporation to meet mortgage amortization obligations were held to be capital contributions even though members also leased property from the corporation). Because petitioner's members have a dual role as users of the CBOT services and facilities and holders of equity interests in the CBOT, we must determine whether the payments were made in consideration of the receipt of goods or services from petitioner or as an investment in the capital of the corporation.

Respondent argues that the transfer fees are payments in consideration of obtaining access to the trading facilities and thus are ordinary income. We disagree. Petitioner charges its members a separate transaction fee for each trade executed on the exchange. A transaction fee is paid in consideration of the use of the trading facilities every time a trade is executed. The transaction fees amounted to more than $40 million in each of the 3 years in issue and are petitioner's primary source of revenue. We are not persuaded that the transfer fees, amounting to less than 1 percent of the transaction fees charged for actual use of the trading facilities, are payments in consideration of the use

of trading facilities, even though payment of the transfer fee is a prerequisite to obtaining or retaining membership.

Respondent also argues that the transfer fees paid to petitioner were for services provided to its members in consideration of and in connection with membership transfers and are thus taxable income. In support of this argument, respondent asserts that, in exchange for the transfer fees, petitioner performs the services listed supra p. 11.

We are not persuaded that these services are provided in consideration of the transfer fee. An indicator of whether a payment is for a good or service is whether the amount of the payment is directly related to the amount and number of services provided or merely incidental thereto. See James Hotel Co. v. Commissioner, 39 T.C. 135, 142 (1962), affd. 325 F.2d 280 (10th Cir. 1963); cf. sec. 1.311-1(e)(1), Income Tax Regs. In the case at hand, the amounts of petitioner's transfer fees have no quantifiable correlation with the amounts or extent of the functions performed or services rendered by the Member Services Department. The same functions are performed for the different classes of members even though they pay different transfer fees. In fact, 432 IDEM memberships were either sold or transferred during the taxable years without the transferees paying any transfer fees, and the Member Services Department performed the same functions with respect to these transfers as it would have

performed for a full membership transferee who paid $1,000. Petitioner, in some instances, assesses the same fees despite substantial differences in the amounts of services. For instance, the transfer fee for an intrafamily transfer of a full membership, which requires few of the services listed, is normally $1,000, the same transfer fee payable in connection with an outright sale of a full membership, which requires the entire range of services.

In contrast to the transfer fees, the application fees paid in connection with applications for CBOT memberships are directly related to the services performed in connection with the applications. Short-form applications, which obviously require fewer services, require a lower fee than full applications. The application fees are based on the services rendered and, as such, are treated as ordinary income. On the other hand, the transfer fees are not based on the functions performed. Rather, the transfer functions are performed incidentally to the paying of the transfer fee. The lack of correlation between the different transfer fees and the functions performed by the Member Services Department supports the conclusion that the transfer fees are not payments for or in consideration of these services.

The parties agree that the payor's motive controls whether a payment is a contribution to capital, whether the payor is a nonshareholder, see United States v. Chicago, B & Q. R.R., 412 U.S. 401, 411-413 (1973); Brown Shoe Co. v. Commissioner, 339

U.S. at 591, or a shareholder, <u>Washington Athletic Club v. United States</u>, 614 F.2d 670, 673-677 (9th Cir. 1980). If the payor is a shareholder, we specifically look to see whether the payor has an investment motive in making the payment. See, <u>id</u>. (holding the investment motive to be the crucial element of capital contributions). If an investment motive exists, then the payment is a contribution to capital. See <u>Lake Petersburg Association v. Commissioner</u>, T.C. Memo. 1974-55 (holding that payments of assessments to a housing cooperative were capital contributions and not membership fees for services turned on the conclusion that an investment motive existed); <u>Minnequa Univ. Club v. Commissioner</u>, <u>supra</u> (an investment interest in members' payment of assessments to a social club led to the conclusion that the payments were contributions to capital). The question in the case at hand is whether the CBOT members had an investment motive in paying the transfer fee.

Direct proof of the motive of the payor is rarely available.[13] Whenever state of mind is relevant under the tax laws, the most important operational question usually concerns the weight to be attached to external factors. Blum, "Motive,

---

[13] None of petitioner's members testified about their motives in paying the transfer fees. However, petitioner's Senior Vice President of Planning and Operations, Frank Grede, testified that petitioner's management views the transfer fees as necessary for applicants to understand and recognize that they are the owners of the association.

Intent, and Purpose in Federal Income Taxation", 34 U. Chi. Law Rev. 485, 544 (1967); cf. Recklitis v. Commissioner, 91 T.C. 874, 910 (1988) (the objective "badges" or indicia of fraud under sec. 6663); sec. 1.183-2(b), Income Tax Regs. (enumerating the objective factors taken into account evidencing a profit motive). The proper tax characterization cannot turn on the separate intentions of multiple participants in an organization, since each participant is apt to take a different view. Blum, supra at 539. Instead, motive or intent must be determined at the institutional level, which necessarily requires an examination of external factors. Therefore, we look to the objective facts and circumstances surrounding the payment to determine whether the members must or should be deemed to have an investment motive in paying the transfer fees.

There is no preexisting checklist of objective factors that can be used as a template for deciding if the payors have an investment motive. Therefore, we look to other shareholder/club member capital contribution cases to isolate the objective factors that have tended to show an investment motive.

The transfer fees are similar to assessments paid by owners of interests in a housing cooperative, because any assessment paid by the cooperative owners can arguably be a charge for the privilege of residing on the premises, just as, respondent argues, the transfer fee should be considered merely another

charge for the privilege of trading on the CBOT.  However, we held early on that some kinds of assessments imposed upon cooperative housing members by the cooperative are nontaxable contributions to capital.  We will look to these cases to find some of the objective factors for our inquiry.[14]

In 874 Park Ave. v. Commissioner, 23 B.T.A. 400 (1931), a housing cooperative corporation, pursuant to the terms of the proprietary leases, levied assessments on its tenant-shareholders for the purpose of amortizing debt secured by mortgages on its property.  The taxpayer used the assessments to amortize the mortgage debt and credited the payments to its capital stock account.  The Board of Tax Appeals held that these assessments

---

[14]  Respondent argues that housing cooperative cases are inapplicable because of "the special relationship between the shareholder-tenants and the cooperative, insofar as the tax statutes are concerned", citing Eckstein v. United States, 196 Ct. Cl. 644, 665, 452 F.2d 1036, 1048 (1971), which concerned whether the payments by tenant-shareholders to be applied to the mortgage were income to the corporation for the purpose of the 80-percent requirement of sec. 216(b).  Eckstein refers to cases cited in Lake Forest, Inc. v. Commissioner, T.C. Memo. 1963-39, on which Eckstein relies, along with Cambridge Apartment Bldg. Corp. v. Commissioner, 44 B.T.A. 617 (1941), and 874 Park Ave. v. Commissioner, 23 B.T.A. 400 (1931).  All this Court said in Lake Forest is that it did not interpret United Grocers, Ltd. v. United States, 308 F.2d 634 (9th Cir. 1962); James Hotel Co. v. Commissioner, 39 T.C. 135 (1962), affd. 325 F.2d 280 (10th Cir. 1963); Affiliated Govt. Employees Distrib. Co., 37 T.C. 909 (1962), affd. 322 F.2d 872 (9th Cir. 1963); Federal Employees' Distrib. Co. v. United States, 206 F. Supp. 330 (S.D. Cal., 1962), judgment revd. 322 F.2d 891 (9th Cir. 1963), as requiring a different result.

were nontaxable contributions to capital because they were provided for in the leases and used for capital purposes.

In Cambridge Apartment Bldg. Corp. v. Commissioner, 44 B.T.A. 617 (1941), the Commissioner determined deficiencies against a cooperative housing corporation on the ground that assessments collected from the tenant-shareholders for the ostensible purpose of retiring bonded indebtedness were income to the corporation. The taxpayer used most of the funds for operating expenses, but used any excess funds to retire its bonds. The Board, relying on 874 Park Ave., held that the excess of assessments used to retire bonds were nontaxable contributions to capital, notwithstanding the lack of an explicit agreement between the corporation and the shareholders or any requirement that the corporation use the excess funds to retire the bonds.

Our most recent opinion on the housing coop capital contribution issue, Concord Village, Inc. v. Commissioner, 65 T.C. 142 (1975), is instructive. The taxpayer was a nonstock not-for-profit housing corporation operated for the benefit of its members, who had proprietary interests. However, upon the sale of their interests, members were required under the taxpayer's bylaws to forfeit to the corporation the part of the sale price that exceeded the FHA transfer value. We held that the forfeitures were taxable gain to the taxpayer, but that all proceeds of assessments accumulated in the taxpayer's replacement

reserve were nontaxable contributions to capital.  We upheld capital contribution treatment of the assessments on the ground that the replacement reserve was in a separate bank account earmarked solely for capital expenditures, and the member received no goods or services in consideration for the payments to the replacement reserve.  Although we were concerned that members had no right, upon the transfer of their memberships or at any other time, to any of the contributed amounts in the replacement reserve, we concluded that this did not compel a different result because it did appear that the amounts contributed to the replacement reserve did bear some relation to the value of the members' equity in the taxpayer.  Id. at 157.

Cases that have denied capital contribution treatment, on which respondent relies, are also instructive in determining the characteristics of a capital contribution.

In United Grocers, Ltd. v. United States, 308 F.2d 634 (9th Cir. 1962), the taxpayer, a grocery-buying cooperative, charged its members monthly dues to participate in the cooperative.  The Court of Appeals for the Ninth Circuit concluded that the members had no investment motive in paying the dues because memberships were not transferable, and there was no way that members could recover their investments in the corporation.

In Washington Athletic Club v. United States, 614 F.2d 670 (9th Cir. 1980), the court concluded that the membership-type

fees, although earmarked for capital expenditures, could not be treated as capital contributions because the members had no equity interest in the club and received no legal entitlement for the payment of the fees other than access to the club and the right to vote for the board of directors. The court commented that the earmarking of the payments for capital expenditures was relevant and pertinent, but not determinative of, a contribution to capital. Id at 675.

In Affiliated Government Employees Distrib. Co. v. Commissioner, 37 T.C. 909 (1962), affd. 322 F.2d 872 (9th Cir. 1963), we addressed whether membership fees paid to the taxpayer, a nonstock membership corporation operating department stores for the exclusive use of its members and their guests, were contributions to capital. We held that the fees were payments for the privilege of shopping at the taxpayer's stores and were not contributions to capital because the members were not entitled to share in the profits of the enterprise and had no assurance of a share in the dissolution proceeds because the memberships were nonassignable and terminated at death. Id. at 918.

In Oakland Hills Country Club v. Commissioner, 74 T.C. 35 (1980), we denied a country club's motion for summary judgment, holding that a "proprietary interest" is not sufficient to turn a membership fee into a capital contribution. However, the members

could not resell their memberships or profit from appreciation in the value of the membership.  We found the only benefit to the members was their right to use the club's facilities.

In American Medical Association v. United States, 887 F.2d 760 (7th Cir. 1989), the Court of Appeals for the Seventh Circuit, to which an appeal in this case would lie, provided useful guidance in dealing with the member capital contribution issue.  In holding that member dues placed in the AMA's "association equity" reserve account were current membership receipts that could be allocated to circulation income in the year received, the court rejected the taxpayer's alternative argument that membership fees so placed "should be likened to capital contributions."  Id. at 773.  The Court of Appeals explained:

> The problem with this argument is that the AMA members received nothing in return for their "investment" in the AMA other than the right to receive the benefits of membership in the single annual period for which dues were assessed.  In exchange for a capital contribution the contributor receives a future or residual claim, for example, for return of capital as dividends or as the proceeds of liquidation.  A capital contribution is in the nature of an investment whereby the investor purchases a continuing interest in an enterprise.[14] In this case there is no evidence that AMA members received anything more for their annual membership fee than an annual membership; they received no claim of future benefit.
>
> 14.  See, e.g., Commissioner v. Fink, 483 U.S. 89, 97 * * * (1987) (contributors must intend "to protect or increase the value of their investment in the corporation"); In the Matter of Larson, 862 F.2d 112, 117 (7th Cir. 1988)(capital contribution characterized

by fact that investor expects to recoup her investment, hopefully with a profit, in the event the corporation is successful.

Id. at 773-774.

Explaining and applying Washington Athletic Club v. United States, supra, the Court of Appeals noted:

Since members received no benefit through payment of the surcharge other than the rights attendant to an annual membership in the club, the members lacked an "investment motive" in making the payments, and therefore treatment of the monies received as a capital contribution was inappropriate. [Id.]

The reasoning of Washington Athletic Club is persuasive, and directly applicable here. The AMA's members received no continuing benefit from their payments into the association equity account; the sum paid as an annual membership fee entitled the member only to the benefits of membership in the year of payment. Therefore the funds placed in the association equity account were current "income" of the AMA * * *. [American Medical Association v. United States, supra at 774.]

In reconciling the cases relied upon by petitioner and respondent, we discern three objective factors whose presence tends to support the existence of an investment motive: (1) The fee in question is earmarked for application to a capital acquisition or expenditure; (2) the payors are the equity owners of the corporation and there is an increase in the equity capital of the organization by virtue of the payment; and (3) the members have an opportunity to profit from their investment in the corporation.

The first factor is whether the payment is specifically earmarked or applied to a capital acquisition or expenditure. Webster's Ninth New Collegiate Dictionary defines earmarking as "to designate or set aside (funds) for a specific use or owner".

The repealed excise tax on club dues[15] and the regulations thereunder provide an appropriate framework for giving content to the concept of earmarking as it should be applied in this case.[16] Section 4241 imposed an excise tax on club dues and section 4243 provided an exemption from the excise tax for members' payments for the construction or reconstruction of capital improvements.[17] The structure for imposing the club dues excise tax and allowing the capital expenditure exemption parallels the approach under section 118 for differentiating payments for services from capital contributions; amounts that corporate shareholders or association members pay for the use of corporation or association facilities and services are ordinary income to the recipient,

---

[15]   Secs. 4241 and 4243, and the regulations thereunder, were repealed by sec. 301 of the Excise Tax Reduction Act of 1965, Pub. L. 89-44, 79 Stat. 145.

[16]   The Commissioner has recognized that Federal income tax principles can be relevant to the consideration of Federal excise tax issues.  G.C.M. 37989 (June 22, 1979); G.C.M. 36046 (Oct. 9, 1974); G.C.M. 35442 (Aug. 16, 1973).

[17]   Congress enacted sec. 4243 to provide club dues excise tax relief from the burdensome and heavy initial cost of construction or reconstruction of a club facility, whereas "charges which go to the upkeep and operation of social, athletic, or sporting clubs [were to] continue to be taxable." Conf. Rept. 2596, 85th Cong., 2d Sess. 4437-4438 (1958).

whereas their payments in aid of capital improvements are capital contributions.

The interpretive regulations under section 4243 stated that the exemption applied to amounts paid for the retirement of indebtedness (a mortgage loan, for example) incurred by reason of the construction or reconstruction of any capital addition, improvement or facility.[18]  Sec. 49.4243-2(b)(iii), Excise Tax Regs.  However, the regulations did not allow the exemption unless the funds were earmarked for capital purposes.  Id.

In Atlanta Athletic Club v. United States, 277 F.Supp. 669 (N.D. Ga. 1967), the court held that the board's resolution to divert 40 percent of future assessments to qualified purposes allowed the payments so used to qualify for the exemption.  The court based its holding on the facts that the assessments were based upon known existing needs, although no specific project was stated, and the funds, although commingled with operating funds, were held for future construction requirements.

In Gibbons v. United States, 277 F.Supp. 749 (S.D. Ill. 1967), the court held that there was insufficient earmarking for the exception to apply where the members were not told that a

---

[18]  For payments made before Nov. 1, 1959, the regulation stated that "Assessments paid for the retirement of indebtedness (a mortgage loan, for example) incurred by reason of the construction or reconstruction of any such facility * * * are considered to be assessments for construction or reconstruction." Sec. 49.4243-2(a), Excise Tax Regs.

specific portion of fees would be set aside for capital

improvements, and all income and receipts were commingled.  The

court stated that "the amount or proportion to be used for

capital improvements must be stated at the time of 'assessment'

and earmarked for that purpose at the time of receipt."

In Maryland Country Club, Inc. v. United States, 75-2 USTC

par. 16,190 (D. Md. 1975), judgment revd. 539 F.2d 345 (4th Cir.

1976), the court, after examining the above- cited cases[19],

concluded that there were three basic conditions of earmarking:

First, there must be a definite commitment to engage in some

capital construction; second, at the time of the initial payment,

both the club and the member must be operating under the

---

[19]  In addition to the above-cited cases, the court also
examined Cactus Heights Country Club v. United States, 280
F.Supp. 534 (D.S.D. 1967)(holding that a resolution, prior to
collection of the funds, to apply 80 percent of the funds
collected to capital improvements was sufficient to bring that 80
percent within the exception), and Pinehurst Country Club v.
United States, 248 F.Supp 690, 692-693 (D. Colo. 1965).  The
court said that Pinehurst was probably at the clearly qualified
end of the scale of acceptable earmarking, stating that,
"Although earmarking was not in question in that case, the
earmarking which did occur and which was plainly acceptable
serves as a useful example in other cases."  Maryland Country
Club, Inc. v. United States, 75-2 USTC par. 16,190, at 88,952 (D.
Md. 1975), judgment revd. 539 F.2d 345 (4th Cir. 1976).  In
Pinehurst the new members, in addition to paying dues, had an
option of paying an assessment for capital improvements and
construction in cash or in installments.  The amounts paid as
capital contributions were accounted for separately and deposited
in a separate escrow bank account, and thereafter were
transferred directly from the escrow account to a construction
account at which time members who had paid construction
assessments were credited with the amounts not used.

assumption that the funds so collected will be used for capital purposes; and, three, the funds must be accounted for at the time of payment and held for that purpose and for no other purpose. Using this test, the court held that the earmarking requirement had not been met because the club used the amounts in the capital accounts for operating expenses. The court held that this use related back to and invalidated the initial purported earmarking.

In light of this history, we conclude that petitioner's procedures for the collection, accounting, and use of the transfer fees provide sufficient assurance that the transfer fees are dedicated to the required purpose of reducing petitioner's mortgage debt, in accordance with the requirements of rule 243. As in Maryland Country Club v. United States, supra, petitioner's rule 243 illustrates petitioner's definite commitment to engage in a capital use with the funds; i.e., the retirement and redemption of the CBOT building indebtedness, which was incurred to finance capital construction projects. Both petitioner and its members are aware that the transfer fees are collected for a designated purpose. Prospective members are given a copy of, and tested on, petitioner's rules, including rule 243. Finally, the fees are accounted for separately from operating revenues. They are accounted for by book entries as "restricted capital". The funds are held in these accounts until petitioner makes a mortgage principal payment in an amount greater than the amounts

in the book entries.  Only then are the amounts in the book entries reclassified as "unrestricted capital".  The bylaw restriction in rule 243 and the accounting ledger accounts sufficiently restrict the amounts of the transfer fees collected until an equal amount is paid toward the mortgage principal.[20] We thus conclude that petitioner's rule 243 and its accounting procedures sufficiently earmark the transfer fees for use in reducing its mortgage debt, a designated capital expenditure.

The second factor is whether the equity interest of the members increased because of the contribution to the membership organization.  There is no dispute that petitioner's members are the equity owners of petitioner.  They have voting rights and liquidation rights according to the interest held, and their interests are freely transferable to qualified purchasers or transferees.  Because petitioner's largest liability is the mortgage on the CBOT building, any decrease in that liability directly increases petitioner's members' equity.  The transfer fees accounted for over $300,000 of the mortgage principal

---

[20] The Commissioner in Maryland Country Club v. United States, supra, argued that earmarking, under sec. 4243, required that the taxpayer record the funds in a separate bookkeeping account, which was to be matched by available qualified funds in a bank account, and/or to designate funds as capital contributions by some formal mechanism such as a bylaw.  In the case at hand, petitioner records the transfer fees in separate bookkeeping accounts, which are always matched by available qualified funds in its general bank account, and the transfer fees are designated as capital contributions by petitioner's rule 243.

payments made in each of the taxable years.  The members' equity accounts increased each year by an amount no less than the transfer fees collected.

Respondent argues that the members cannot have an investment motive because they enjoy no right to any return of the amount of transfer fees paid in connection with that membership.  We are not persuaded.  There is no requirement that the payments directly increase the individual payor's equity interest on a dollar-for-dollar basis.  Nor is there any requirement that a member must have a right to recover from petitioner the amount of the transfer fee paid.[21]  Although an individual member's interest does not directly reflect the amount of transfer fees paid in connection with that membership, members' equity as a whole is increased by each transfer fee paid.  See Concord Village, Inc. v. Commissioner, 65 T.C. 142, 156 (1975).  We are

---

[21]  Respondent seems to be arguing that, in order for the transfer fees to be capital contributions, petitioner must maintain a capital account for each member that directly reflects the actual amounts paid in respect of that particular membership interest.  Petitioner is a corporation, not a partnership.  There is no such requirement for corporations.  A corporation is a separate legal entity, whereas a partnership is an aggregate of its partners.  Partnership capital accounts reflect what each partner can draw from the partnership.  A corporation does not have individual drawing accounts for each of its shareholders.  Any shareholder simply has an ownership interest in this separate entity represented by the number of shares owned by him.

satisfied that the transfer fees enhance the equity interests of petitioner's members.[22]

The third factor is whether the payor has an opportunity to profit from the appreciation in his investment. The CBOT memberships are freely transferable, allowing the members to realize a profit from any appreciation of their investment.[23]

---

[22] Respondent relied heavily on Rev. Rul. 77-354, 1977-2 C.B. 50, arguing that it requires a finding here that the transfer fees are not capital contributions. A revenue ruling is nothing more than respondent's litigation position, Stark v. Commissioner, 86 T.C. 243, 250-251 (1986); however, the revenue ruling cited actually supports petitioner's position in this case. In Rev. Rul. 77-354, the Internal Revenue Service overruled its position in G.C.M. 4015, VII-1 C.B. 120 (1928), in holding that a securities exchange's initiation fees were not capital contributions. The Service based its holding on the facts that neither new members nor existing members derived any enhanced equity value by virtue of the payment, the funds were not earmarked or restricted in their use to capital expenditures, and the fees bore no relation to the capital needs of the exchange. Here, petitioner's members do derive an enhanced equity value by virtue of the payment of the transfer fee, the funds are earmarked or restricted in their use to a capital expenditure, and the fees bear a relation to the capital needs of the exchange, the mortgage indebtedness. In earlier rulings, the Service had concluded that fees paid by members to membership organizations were capital contributions where members held substantial equity rights in the organizations and the payments enhanced the members' collective interest in the organization. Rev. Rul. 72-132, 1972-1 C.B. 21 (membership certificates sold by an unincorporated securities exchange); Rev. Rul. 74-563, 1974-2 C.B. 38 (special assessments levied by a homeowners association to pave a community parking lot); Rev. Rul. 75-371, 1975-2 C.B. 52 (special assessments levied by a condominium to replace the outdoor furniture surrounding the swimming pool).

[23] The facts of the case at hand are more compelling in justifying capital contribution treatment than many of the above cited cases because the CBOT members suffer no restriction on their rights to retain the entire proceeds of sale of their

(continued...)

Over 35 percent of petitioner's members do not trade on petitioner's exchange, but instead hold their interests for investment. The majority of these members lease their trading privileges to others, but approximately 16 percent of the members neither use their trading privileges nor lease them to third parties, apparently expecting to realize a profit on the ultimate disposition of their memberships.

The transfer fees are used to amortize the debt on a revenue-raising asset, the CBOT building. Petitioner leases 80 to 85 percent of the space in the CBOT building to third parties. The leases generate substantial rental income to petitioner. The CBOT building also houses the trading floor, which generates transaction fees, petitioner's primary source of revenue. It is clear that members' payments of assessments to finance initial construction of those assets would have been contributions to capital because they would have increased the members' equity in

---

[23](...continued)
interests. Some of the members' interests in the cases discussed above, even those allowing capital contribution treatment, were subject to such a restriction. Cf. Concord Village, Inc. v. Commissioner, 65 T.C. 142 (1975); United Grocers, Ltd. v. United States, 308 F.2d 634 (9th Cir. 1962); Washington Athletic Club v. United States, 614 F.2d 670 (9th Cir. 1980); Affiliated Government Employees Distrib. Co. v. Commissioner, 37 T.C. 909 (1962), affd. 322 F.2d 872 (9th Cir. 1963); Oakland Hills Country Club v. Commissioner, 74 T.C. 35 (1980). The restriction on the amount of profit a member can make from his transfer of an interest attenuates the members' financial interest in the equity of the organization. There is no such restriction in the case at hand.

petitioner and directly paid for capital assets used for the production of income in petitioner's trade or business, and there would have been no tenable argument that the payments were in consideration for goods or services. The transfer fees, paid at the time of the acquisition of a membership, reduce the principal of the mortgage debt on the CBOT building each year. The periodic collection of the transfer fees is the equivalent of installment payments for the building. We fail to see a significant difference where petitioner's members make their capital contributions in "installments instead of all at once." See Lake Forest, Inc. v. Commissioner, T.C. Memo. 1963-39; see also sec. 49.4243-2(a), Excise Tax Regs. supra note 18, which equate amounts paid to retire mortgage indebtedness incurred to finance construction or reconstruction of capital improvements with exempt payments for capital improvements.

Petitioner's members have not paid dues since at least 1990. The dues were eliminated because of a surplus in petitioner's operating revenues, largely attributable to petitioner's lease revenues and transaction fees. The nonpayment of dues is a form of additional profit to the members. See Minnequa Univ. Club v. Commissioner, T.C. Memo 1971-305. The transfer fees, therefore, help finance the major sources of petitioner's revenues and directly increase the members' profit potential from their investment.

We conclude that the transfer fees are primarily paid with an investment motive.  Although there may be some attenuated and incidental senses in which the transfer fees may be paid in consideration for services rendered and to be rendered, we hold, on balance, that the transfer fees paid to petitioner are paid primarily to reduce petitioner's mortgage debt, which was incurred to finance capital improvements.  The transfer fees are, therefore, nontaxable contributions to petitioner's capital and are not includable in gross income.

   To reflect the foregoing,

<u>Decision will be entered for</u>
<u>petitioner</u>.