BAUER, Chief Judge.
 

 Debtors-appellants Roger and Joan Larson appeal from the district court’s judgment affirming a decision of the bankruptcy court, which determined that the Internal Revenue Service (IRS) had correctly made deficiency assessments against the Larsons for tax years 1974 and 1975, and that the tax liability was not dischargeable in bankruptcy. We affirm.
 

 I.
 
 Background
 

 In 1973, the Larsons founded Pharmaco, Inc., an Illinois corporation, to exploit certain inventions of Roger Larson. Pharma-co issued 800 of its initial 1,000 shares of stock to the Larsons in exchange for patent rights in the inventions.
 
 [1]
 
 The remaining 200 shares of Pharmaco stock were issued to 22 unrelated shareholders for a total capitalization of $25,000. By March 1974, Pharmaco needed to raise more funds to develop its products. Therefore, in 1974 and 1975, the Larsons sold most of their Pharmaco stock. The Larsons retained approximately $270,000 of the proceeds and transferred the remaining $1,000,000 to Pharmaco. The transfers to Pharmaco were made as soon as possible after the Larsons received the sales proceeds and always within one banking day of receipt. Despite this infusion of cash in ’74 and ’75, Pharmaco apparently continued to experience financial difficulties. In 1976, characterizing their earlier transfers of $1,000,-000 of proceeds from their stock sales as “loans” to Pharmaco, the Larsons forgave the resultant “debts.” Pharmaco nonetheless became insolvent in 1978.
 

 Roger and Joan Larson reported only $130,000 of the proceeds of the 1974 stock sales — i.e., the amount they retained — on their 1974 individual income tax return. On their 1975 return they reported only the $140,000 they retained. The IRS subsequently determined that
 
 all
 
 of the gain on the sales of Pharmaco stock should have been treated as income to the Larsons and that their transfers of part of the proceeds to Pharmaco were contributions to capital. Thus, on September 12,1979, the IRS made deficiency assessments against the Larsons for an additional $198,000 tax due for 1974 and 1975. On October 15, 1979, the Lar-sons filed a petition in bankruptcy pursuant to Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701
 
 et seq.,
 
 which filing was, ae-
 
 *114
 
 cording to the Larsons, “precipitated by representations and assurances given to Larson by representatives of the Internal Revenue Service.” The Larsons claim that IRS agents represented that “any deficiencies determined by an audit assessment could be discharged if they would file bankruptcy.” On February 13, 1980, the bankruptcy court entered an order discharging the Larsons from all dischargeable debts. Despite the alleged “assurances” of its agents, the IRS then filed a proof of claim in the amount of approximately $432,000, which included the amount of the deficiency assessments for 1974 and 1975.
 

 On March 19, 1981, the Larsons filed a complaint in the bankruptcy court to determine their tax liability and its discharge-ability. In two decisions — one following a remand from the district court
 
 [2]
 
 — the bankruptcy court held that: (1) the 1974 and 1975 deficiency assessments were not dis-chargeable in bankruptcy because they were assessed within 240 days of the filing of the bankruptcy petition; (2) the doctrine of equitable estoppel did not bar the IRS from collecting the taxes; (3) all of the gain from the Pharmaco stock sales should have been included in the Larsons’ individual income; (4) the transfers of the proceeds of those sales to Pharmaco constituted contributions to capital rather than loans; (5) upon Pharmaco’s insolvency, the Larsons’ losses were deductible as capital losses rather-than ordinary losses; and (6) pre-pe-tition interest on the tax assessments was not dischargeable in bankruptcy. The district court affirmed all of these determinations. The Larsons appeal, challenging the latter five of the bankruptcy court’s holdings.
 
 [3]
 
 For the reasons explained below, we find no merit in any of the Larsons’ challenges.
 

 II.
 
 Equitable Estoppel
 

 The Larsons claim that they filed for bankruptcy less than 240 days after the tax assessment, making the taxes nondis-chargeable, in reliance on the statements of two IRS agents. They contend that they agreed to drop claims against certain other IRS agents and file for bankruptcy because these two agents assured them that the tax assessments would be discharged in bankruptcy. According to the Larsons, they reasonably relied on the misrepresentations of agents of the IRS in filing their bankruptcy petition on October 15,1984, and the government is therefore estopped from collecting the taxes assessed.
 

 “The general rule is that reliance on misinformation provided by a government employee does not provide a basis for an estoppel.”
 
 Crown v. United States Railroad Retirement Bd.,
 
 811 F.2d 1017, 1021 (7th Cir.1987). Yet, in certain narrow cir
 
 *115
 
 cumstances, “[t]his circuit ... [has] applied the estoppel doctrine to the Government.
 
 See United States v. Fox Lake State Bank,
 
 366 F.2d 962 (7th Cir.1966). But we [have done] so reluctantly, noting that ‘the doctrine of estoppel must be applied with great caution to the Government and its officials.’
 
 Id.
 
 at 965.”
 
 Gressley v. Califano,
 
 609 F.2d 1265, 1267 (7th Cir.1979). Thus, while it is not entirely clear what additional circumstances a party must establish before the doctrine of equitable es-toppel will be applied to the government,
 
 [4]
 
 it is clear that
 
 at least
 
 the traditional prerequisites for the application of the doctrine are required.
 

 “[T]o succeed on a traditional estoppel defense, the litigant must prove (1) a misrepresentation by another party (2) which he reasonably relied upon (3) to his detriment.”
 
 United States v. Asmar,
 
 827 F.2d 907, 912 (3d Cir.1987).
 
 See also In re Colonial Discount Corp.,
 
 807 F.2d 594, 599 (7th Cir.1986). The burden of proof is on the party claiming estoppel.
 
 Asmar,
 
 827 F.2d at 912. We conclude, as did the courts below, that the Larsons failed to establish the elements of a traditional es-toppel defense. First, the evidence that the two IRS agents in fact made the alleged misrepresentations is scant. Second, even assuming that the IRS agents did make the alleged misrepresentations, the Larsons could not have reasonably relied on them. The Larsons were represented by counsel when they filed their bankruptcy petition. It would not be reasonable for an attorney representing a party in a bankruptcy proceeding to rely on the “advice” of IRS agents regarding dischargeability in bankruptcy. This is at least true when, as in this case, the agents’ advice is flatly contradicted by the clear provisions of the Bankruptcy Code.
 

 Moreover, because the Larsons were dealing with the government, they are charged with knowledge of the law “and may not rely on the conduct of Government agents contrary to law.”
 
 Heckler v. Community Health Services of Crawford,
 
 467 U.S. 51, 63, 104 S.Ct. 2218, 2225, 81 L.Ed.2d 42 (1984). Similarly, “ ‘anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.’ ”
 
 Id.
 
 at 63 n. 17, 104 S.Ct. at 2225 n. 17 (quoting
 
 Federal Crop Insurance Corp. v. Merrill,
 
 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947)). Thus, the Second Circuit has stated, “[i]t is well established that ‘estoppel cannot be set up against the Government on the basis of an unauthorized representation or act of an officer or employee who is without authority ... to bind the Government.’ ”
 
 Goldberg v. Weinberger,
 
 546 F.2d 477, 480-81 (2d Cir.1976) (quoting
 
 Byrne Organization, Inc. v. United States,
 
 287 F.2d 582, 587, 152 Ct.Cl. 578 (1961)),
 
 cert. denied,
 
 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed. 2d 255 (1977). As the government argues, it would appear that statements regarding the Bankruptcy Code are not within IRS agents’ authority, and the Larsons make no attempt to show that such statements are authorized.
 

 We therefore conclude, mindful of the “great caution” that we must exercise in applying the doctrine of equitable estoppel to the government, that both the bankruptcy court and the district court correctly refused to do so. The IRS is not estopped from assessing the taxes at issue.
 

 III.
 
 Individual Income
 

 The second determination that the Larsons challenge on appeal is the bankruptcy court’s finding, affirmed by the district court, that all of the proceeds of the sales of their Pharmaco stock were properly included in their individual income. The bankruptcy court found that the Larsons control over the disposition of the proceeds was sufficient to require them to report receipt of the proceeds as income. The Larsons contend that this finding is clearly
 
 *116
 
 erroneous — that they acted as a mere “conduit” for that portion of the proceeds that were transferred to Pharmaco. In support of this contention, they rely on certain letters that Roger Larson sent to Pharmaco’s other stockholders when offering the Phar-maco stock for sale. In one letter, dated September 28, 1974, Larson stated, “When you buy stock directly from me you know the bulk of the money is going to the company in the form of loans from me to Pharmaco.” In a subsequent letter, dated October 7, 1974, Larson told the stockholders he was “willing to sell [his] stock and loan most of the proceeds to Pharmaco.” Additionally, the Larsons emphasize that, although the proceeds were initially placed in Larson’s bank account, they were transferred to Pharmaco’s account within one banking day.
 

 These facts give us no reason to depart from the long established principle that “[t]he power to dispose of income is the equivalent of ownership of it. The exercise of that power to procure the payment of income to another is the enjoyment and hence the realization of the income by him who exercises it.”
 
 Helvering v. Horst,
 
 311 U.S. 112, 118, 61 S.Ct. 144, 147-48, 85 L.Ed. 75 (1940). The Larsons argue, however, that at the time of the stock sales they did not control the disposition of the proceeds. They contend that Roger Larson had already committed himself to transfer most of the proceeds to Pharmaco.
 

 We need not decide whether such a unilateral “commitment” could ever shield a taxpayer from tax liability based upon the receipt of funds so committed, though we have recently stated that “in tax law a payment attributable to a person’s earnings that bypasses him and goes to his designees is taxed as a payment to him.”
 
 In re Kochell,
 
 804 F.2d 84, 85 (7th Cir. 1986) (citing
 
 Douglas v. Willcuts,
 
 296 U.S. 1, 56 S.Ct. 59, 80 L.Ed.3 (1935),
 
 Lucas v. Earl,
 
 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930), and
 
 Old Colony Trust Co. v. Commissioner,
 
 279 U.S. 716, 729, 49 S.Ct. 499, 504, 73 L.Ed. 918 (1929)). In the present case, the courts below found that at the time of the stock sales the Larsons retained control over the disposition of the proceeds and Larson’s letters to the stockholders are insufficient to render that finding erroneous.
 

 As the government points out, at least three facts support the lower courts’ conclusion. First, the Larsons sold stock that they personally owned. Second, Roger Larson alone determined the amount of the funds which were subsequently transferred to Pharmaco. And third, Larson purported to “loan” the funds to Pharmaco, receiving a promissory note in return. In the face of these facts, Larson’s letters to the stockholders, which did not in any way commit him to use any particular amount of the proceeds for Pharmaco’s benefit, are insufficient to establish that the Larsons acted as a mere “conduit” for the sales proceeds. Indeed, the letters themselves state that the proceeds would be “loaned” to Pharma-co, suggesting that they were the Larsons’ to “loan.” We therefore affirm the determination that all of the proceeds of the sales of Pharmaco stock were includable in the Larsons’ individual income.
 

 IV.
 
 Contributions to Capital v. Loans
 

 The Larsons next contend that, even if the proceeds of the stock sales were income to them, the subsequent transfers of the funds to Pharmaco were loans rather than contributions to capital.
 
 [5]
 
 This question has been variously described as one of fact and one of law.
 
 Saviano v. Commissioner,
 
 765 F.2d 643, 646 (7th Cir. 1985);
 
 Roth Steel Tube Co. v. CIR,
 
 800 F.2d 625, 629 (6th Cir.1986),
 
 cert. denied,
 
 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d
 
 *117
 
 496 (1987). Whether our standard of review is the clearly erroneous standard used to review questions of fact or the
 
 de novo
 
 standard used for questions of law, however, we would affirm the bankruptcy court’s conclusion that the transfers were contributions to capital.
 

 The Larsons essentially make two arguments in an attempt to persuade this court otherwise. One is that it is simply “absurd” to believe that an individual would transfer over a million dollars to a company if he did not expect repayment. They thus argue that “[t]he size of the transfer
 
 in and of itself
 
 should be sufficient reason” for a finding that the transfers were loans. We find this argument unpersuasive. Certainly investors often contribute large sums of capital to corporations. This is so because such transfers, though characterized as “contributions to capital,” are not “contributions” in the sense of charitable donations. The distinction between a capital investor and a creditor is not that the latter expects repayment while the former does not. It is that the creditor expects repayment regardless of the debtor corporation’s success or failure, while the investor expects to make a profit (hoping for a larger profit than the creditor will make in interest)
 
 if
 
 as he no doubt devoutly wishes, the company is successful. We therefore reject the appellants’ notion that the size of a transfer alone can compel a finding that it is a loan rather than a capital contribution.
 

 In a related argument, the Larsons contend that the primary basis for the bankruptcy court’s determination that the transfers at issue were capital contributions was Roger Larson’s testimony that he did not expect to be repaid. In context, Larson testified that he expected to be repaid
 
 only if
 
 Pharmaco was successful. This indicates that he acted as a classic capital investor
 
 hoping
 
 to make a profit, not as a creditor expecting to be repaid regardless of the company’s success or failure.
 
 See, e.g., Saviano,
 
 765 F.2d at 646;
 
 Roth Steel Tube Co.,
 
 800 F.2d at 630;
 
 Bauer v. Commissioner,
 
 748 F.2d 1365, 1367 (9th Cir. 1985);
 
 Adelson v. United States, 737
 
 F.2d 1569, 1571 (Fed. Cir.1984). Moreover, Larson’s testimony, though highly probative, was not, in fact, the sole basis of the bankruptcy court’s determination. That court noted, in addition, that, although Larson testified that Pharmaco issued a promissory note evidencing the loans, no note was produced at trial and Larson could not recall whether the alleged note provided for payment of interest or a fixed maturity date. Moreover, Pharmaco was thinly capitalized, with a total capitalization of only $25,000, and had a debt-to-equity ratio of over 43 to 1 (not considering any debt but the advances made by Larson). Finally, the court found that it was doubtful that Pharmaco could have obtained a similar loan from an independent lending institution. All of these were proper considerations and all pointed in the direction of capital contributions rather than loans.
 
 See Roth Steel Tube Co.,
 
 800 F.2d at 630-32;
 
 Bauer,
 
 748 F.2d at 1368. We therefore concur in the characterization of the transfers of the Pharmaco stock sales proceeds as contributions to capital.
 

 V.
 
 Applicability of the Com Products Doctrine
 

 The Larsons next argue that, despite the characterization of their transfers of funds to Pharmaco as capital contributions, they are entitled to an ordinary loss deduction under the
 
 Com Products
 
 doctrine.
 
 [6]
 
 Because the courts below found
 
 *118
 
 that the Larsons had a predominant business motive in their transactions in Phar-maco stock, they determined that the
 
 Com Products
 
 doctrine was inapplicable in this case. The Larsons contend that that determination was erroneous.
 

 This contention is irrelevant given the Supreme Court’s decision in
 
 Arkansas Best Corp. v. Commissioner,
 
 — U.S. -, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988).
 
 [7]
 
 In that case, the Supreme Court, in response to lower courts’ overly broad interpretation of
 
 Com Products,
 
 cabined the doctrine by holding that the Court’s opinion in
 
 Com Products
 
 was limited to an interpretation of the inventory exclusion of § 1221.
 
 [8]
 
 The Court explicitly held “that
 
 Corn Products
 
 is properly interpreted as standing for the narrow proposition that hedging transactions that are an integral part of a business’ inventory-purchase system fall within the inventory exclusion [to the definition of ‘capital asset’] of § 1221 [of the Tax Code].”
 
 Arkansas Best,
 
 108 S.Ct. at 977. Because the Pharmaco stock at issue here is clearly not within the inventory exclusion, the Supreme Court’s conclusion in
 
 Arkansas Best
 
 applies as well in this case:
 

 [A] taxpayer’s motivation in purchasing an asset is irrelevant to the question whether the asset is ... within § 1221’s general definition of “capital asset.” Because the capital stock held by [the Lar-sons] falls within the broad definition of the term “capital asset” in § 1221 and is outside the classes of property excluded from capital-asset status, the loss ... is a capital loss.
 

 Id.
 
 at 978.
 

 VI.
 
 Dischargeability of Pre-petition Interest
 

 Finally, the Larsons urge us, in cursory fashion, to reverse the bankruptcy
 
 *119
 
 court’s holding that the pre-petition interest on their 1974 and 1975 tax liabilities is not dischargeable in bankruptcy. The entire argument on this issue contained in their opening brief consists of a lengthy quotation from
 
 In re Razorback Ready-Mix Concrete Co.,
 
 45 B.R. 917 (Bankr.E.D. Ark.1984). Subsequent to the filing of the Larsons' opening brief, the holding in
 
 Razorback
 
 was explicitly overruled in
 
 In re Stonecipher Distributors, Inc.,
 
 80 B.R. 949 (Bankr.W.D.Ark.1987). The Larsons thus admit in their reply brief that bankruptcy court decisions now unanimously agree that pre-petition interest is to be accorded the same priority as the underlying claim. We see no reason to depart from this unanimous authority.
 

 Section 101(4)(A) of the Bankruptcy Code, 11 U.S.C. § 101(4)(A), provides that the term “claim” means a “right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.” This broad definition of a “claim” as a “right to payment” has been read to include interest.
 
 See, e.g., In re Brinegar,
 
 76 B.R. 176, 178 (Bankr.Colo. 1987);
 
 In re Young,
 
 70 B.R. 43, 45 (Bankr. S.D.Ind.1987);
 
 In re Treister,
 
 52 B.R. 735, 737 (Bankr.S.D.N.Y.1985). This is consistent with the language of Section 502 of the Bankruptcy Code, which governs what is to be allowed as part of a creditor’s claim in bankruptcy proceedings:
 

 (b) ... [T]he court ... shall determine the amount of such claim ... as of the date of the filing of the petition, and shall allow such claim in such amount except to the extent that—
 

 (2) such claim is for
 
 unmatured
 
 interest. ...
 

 11 U.S.C. § 502 (emphasis added);
 
 see In re Pharmadyne Laboratories, Inc.,
 
 53 B.R. 517, 522 (Bankr.N.J.1985). Pre-petition (or
 
 matured)
 
 interest has therefore been treated as part of the “claim,” accorded the same priority status as the underlying liability, and found nondischargeable where the underlying liability is nondischargeable.
 
 See, e.g., Brinegar,
 
 76 B.R. at 178-79;
 
 Young,
 
 70 B.R. at 45;
 
 In re EEI Energy, Inc.,
 
 75 B.R. 637, 638-39 (Bankr.N.D.Ill. 1987);
 
 In re Mikrut,
 
 79 B.R. 404, 408-09 (W.D.Wisc.1987);
 
 In re H.G.D. & J. Mining Co.,
 
 74 B.R. 122, 125 (Bankr.S.D.W.Va. 1986),
 
 aff'd by unpublished opinion,
 
 836 F.2d 546 (4th Cir.1987);
 
 Treister,
 
 52 B.R. at 737;
 
 In re Keller & Katkowsky, P.C.,
 
 55 B.R. 155, 157 (Bankr.E.D.Mich.1985);
 
 Pharmadyne,
 
 53 B.R. at 522;
 
 In re Healis,
 
 49 B.R. 939, 942 (Bankr.M.D.Pa.1985).
 

 Here it is uncontested that the underlying tax liability is nondischargeable. The pre-petition interest is thus similarly non-dischargeable.
 

 VII.
 
 Conclusion
 

 For the foregoing reasons, we find no merit in any of the appellants’ arguments. The judgment of the district court, affirming the bankruptcy court, is in all respects
 

 AFFIRMED.
 

 [1]
 

 . The agreement between Roger Larson and Pharmaco also entitled Larson to a 5% royalty on all revenues obtained by Pharmaco from sales of the products he had patented.
 

 [2]
 

 . On appeal from the bankruptcy court’s first decision, the district court found that the bankruptcy court’s initial order contained inconsistent characterizations of the transfers. The district court therefore reversed and remanded the case for a further determination of whether the transfers were capital contributions or loans. The district court also directed the bankruptcy court to reconsider whether the transfers fell within the ambit of the
 
 Corn Products
 
 doctrine,
 
 see Corn Products Refining Co. v. Commissioner,
 
 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), in light of the Tax Court’s holding in
 
 W. W. Windle
 
 that a predominant business motive is insufficient to trigger ordinary asset treatment if a substantial investment motive is also present.
 
 W.W. Windle Co. v. Commissioner,
 
 65 T.C. 694 (1976) [available on WESTLAW, 1976 WL 3741]
 
 appeal dismissed,
 
 550 F.2d 43 (1st Cir.),
 
 cert. denied,
 
 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977). On remand the bankruptcy court unambiguously held that the transfers were contributions to capital and that the Larsons were not entitled to an ordinary loss deduction under the
 
 Com Products
 
 doctrine because they had a substantial business motive.
 

 [3]
 

 . On appeal it is undisputed that the taxes involved are nondischargeable under §§ 523(a)(1)(A) and 507(a)(6)(A)(ii) of the Bankruptcy Code. At the times relevant to this case, § 523 of Title 11 of the United States Code provided:
 

 (а) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt
 

 (1) for a tax ...—
 

 (A) of the kind and for the periods specified in section 507(a)(2) or 507(a)(6) of this title. ...
 

 Section 507(a) of Title 11 specified:
 

 (б) ... allowed unsecured claims of governmental units, to the extent that such claims are for — (A) a tax on or measured by income or gross receipts — ... (ii) assessed within 240 days ... before the date of the filing of the
 

 [4]
 

 . For a recent discussion of the different approaches taken by the various circuits,
 
 see United States
 
 v.
 
 Asmar,
 
 827 F.2d 907, 911 n. 4 (3d Cir.1987). The Third Circuit in
 
 Asmar
 
 notes that a majority of circuits, in certain circumstances, now "recognize the validity of an estop-pel defense against governmental parties."
 
 Id.
 
 at 912.
 

 [5]
 

 . The proper characterization of the transfers determines the tax treatment to which the Lar-sons were entitled upon the insolvency of Phar-maco. If the transfers were loans, the Larsons could deduct the 1974 and 1975 loans as business bad debts in 1978 when Pharmaco became insolvent.
 
 See
 
 26 U.S.C. § 166. Business bad debts are given ordinary loss treatment under § 166. If, on the other hand, the transfers were capital contributions, the amounts transferred would be added to the basis of the Larsons' stock.
 
 See
 
 26 U.S.C. §§ 1011, 1012. Then, when the stock became worthless, the Larsons would be entitled to a capital loss equal to their basis.
 
 See
 
 26 U.S.C. § 165(g).
 

 [6]
 

 . In
 
 Com Products Refining Co. v. Commissioner,
 
 the taxpayer was a manufacturer of products derived from corn which had purchased corn futures to assure a source of raw material for its business. The Supreme Court likened the taxpayer's corn futures contracts to an inventory of raw corn and held that, under the predecessor to § 1221, the taxpayer was not entitled to treat profits it made on the corn futures transactions as capital gains. Instead they were given ordinary income treatment.
 

 From this seed the
 
 "Com Products
 
 doctrine" grew. Under that doctrine, various courts have held that the characterization of property, including capital stock, as a capital asset, depends on the extent to which a taxpayer's acquisition of the property stemmed from a "business” rather than an "investment” purpose, with a business motive leading to ordinary asset treatment and an investment motive leading to capital asset treatment. As the doctrine developed, the
 
 *118
 
 presence of a "substantial” investment motive would preclude its application. A “predominant” business motive was held insufficient to invoke the doctrine if there was also a "substantial" investment motive.
 
 W.W. Windle v. Commissioner,
 
 65 T.C. 694 (1976),
 
 appeal dismissed,
 
 550 F.2d 43 (1st Cir.),
 
 cert. denied,
 
 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977).
 

 [7]
 

 . In their opening brief, filed while
 
 Arkansas Best
 
 was pending in the Supreme Court, the Larsons appeared to agree that the Court’s decision in that case would be dispositive. However, in their reply brief, filed after
 
 Arkansas Best
 
 was decided, they attempt to avoid application of the Court’s holding to their case by arguing that it represents a change in the law; the transactions at issue occurred in 1974 and 1975 and the law in effect at the time of the transactions is the law which should be applied in determining their effect. It could be answered simply that the
 
 Tax Code
 
 has not changed. Moreover, to the extent that the debtors argue that the decision in
 
 Arkansas Best
 
 interpreting the Code should not be applied retroactively to their case, they do not develop the argument. At any rate, we conclude that
 
 Arkansas Best
 
 may be applied retroactively.
 

 Although the transaction at issue in
 
 Arkansas Best
 
 itself occurred between 1968 and 1975, the Court did not explicitly address the retroactivity issue. The test for determining whether a decision should be applied only prospectively is that enunciated by the Supreme Court in
 
 Chevron Oil Co. v. Huson,
 
 404 U.S. 97, 106-07, 92 S.Ct. 349, 355-56, 30 L.Ed.2d 296 (1971). The first part of the three-part
 
 Chevron
 
 test is "whether [the Supreme Court’s decision] effectively overruled
 
 clear precedent in this circuit
 
 upon which litigants may have relied.”
 
 Anton v. Lehpamer,
 
 787 F.2d 1141, 1143 (7th Cir.1986) (emphasis added). The only case from this circuit on which the Larsons rely in support of their argument that the
 
 Com Products
 
 doctrine as interpreted prior to
 
 Arkansas Best
 
 would dictate ordinary loss treatment is
 
 John J. Grier Co. v. United States,
 
 328 F.2d 163 (7th Cir.1964). In
 
 Grier Co.
 
 this court did not specifically mention the Supreme Court’s decision in
 
 Com Products.
 
 Moreover,
 
 Grier Co.
 
 contradicted this court’s earlier observation in
 
 Faroll v. Jarecki,
 
 231 F.2d 281 (7th Cir.),
 
 cert. denied,
 
 352 U.S. 830, 77 S.Ct. 45, 1 L.Ed.2d 51 (1956), that
 
 Com Products
 
 was, as the Supreme Court has now explicitly stated in
 
 Arkansas Best,
 
 limited to hedging transactions that fall within the inventory exception of § 1221. It thus appears that
 
 Arkansas Best
 
 does not overrule clear precedent in this circuit and under a
 
 Chevron
 
 analysis may be applied retroactively.
 

 [8]
 

 . Section 1221 of the Internal Revenue Code, 26 U.S.C. § 1221, defines the term "capital asset” as "property held by the taxpayer (whether or not connected with his trade or business)” and goes on to except from that general definition five specified categories of property. The first exception (the "inventory exclusion”) is for "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.” 26 U.S.C. § 1221(1).