**In re ATLANTIC LITTLENECK CLAMFARMS, INC., Debtor.**

**Bankruptcy No. 96–72333–W.**

United States Bankruptcy Court, D. South Carolina.

March 28, 1997.

L. Michael Allsep, Charleston, SC, for Debtor.

R. Geoffrey Levy, Columbia, SC, for William B. Cummins.

Charles P. Summerall, Charleston, SC, for Seafood Holdings, Ltd.

## ORDER

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER comes before the Court pursuant to the Motion to Compel Debtor to Accept Executory Contracts or Alternatively for Order Fixing Time for Filing Proofs of Claim Pursuant to 11 U.S.C. § 365 ("Motion to Compel") filed by William B. Cummins ("Movant") in his capacity as nominee of numerous holders of Aquaculture Investment Agreements ("Investment Agreements") with the Debtor. The Investment Agreements and related documents describe holders as "Aquaculture Investors" or "Investors", and those terms are also utilized in this Order.

The Debtor and the Unsecured Creditors' Committee ("Committee") filed objections to the Motion to Compel, and a hearing was held on January 29, 1997 (the "Hearing"). At the Hearing, and over the objection of the Movant's counsel, the Court also permitted counsel for Seafood Holdings, Ltd. ("Seafood Holdings"), the parent company of the Debtor, to participate in the objections to the Motion to Compel.

The Movant asserts in the Motion to Compel that the Investment Agreements consti-

tute executory contracts under § 365 that, if rejected by the Debtor, would give rise to unsecured claims against the Debtor. The objecting parties deny that the Investment Agreements are executory contracts and assert that the Investors are equity interest holders rather than creditors of the Debtor.

As a result of the pleadings filed with the Court, the arguments presented by counsel for the respective parties, the evidence presented at the hearing, and the entire record before the Court in this case, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. The Debtor is a South Carolina corporation which filed for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. Sections 101 et seq. ("Bankruptcy Code")[1] on April 4, 1996 (the "Petition Date"). The Debtor remains in possession of its business operations pursuant to Section 1107(a).

2. The Debtor is in the business of commercial aquaculture and farms hard clams in the coastal waters of South Carolina and Florida. The Debtor undertakes all stages of clam production from the initial seed to fully grown, edible product. The Debtor maintains laboratory facilities for inspecting the clams and market preparation facilities for purifying and packaging the clams for sale.

3. This case involves competing plans proposed by the Debtor and Star Fish, LLC ("Star Fish"). Star Fish's senior management is comprised of Tom Royal and Dr. John Manzi, both of whom were employed by the Debtor until their termination shortly after the Petition Date. At the time of their termination, Mr. Royal was the Debtor's vice president of marketing and sales, and Dr. Manzi was the Debtor's senior vice president and technical director.

4. At the Hearing, the Court approved the Disclosure Statements of both the Debtor and Star Fish, and permitted the Debtor and Star Fish additional time to submit addenda to their respective Disclosure Statements. Star Fish's counsel also represents the Movant, as nominee of the Aquaculture Investors. At the Hearing, the Movant expressed his support for Star Fish's Disclosure Statement and proposed Plan.

5. By Consent Order Appointing Examiner entered December 3, 1996, the Court appointed John F. Curry as an examiner ("Examiner") pursuant to Section 1104(c) with full authority to investigate certain allegations of misconduct pertaining to the Debtor's management. The Examiner filed his Examiner's Report on January 23, 1997.

6. Both the Debtor's Disclosure Statement and Star Fish's Disclosure Statement state that the Investment Agreements were used to attract investment and that the Investment Agreements were offered under Regulation D[2] of the Securities Act of 1933.[3] Most of the Investment Agreements were sold to California investors, who are described in both Disclosure Statements as "passive investors".[4]

7. It is undisputed that the Investors paid the Debtor a total of more than $3,000,000 for the Investment Agreements[5] It is also undisputed that the Investors through the Investment Agreements rely on the Debtor's knowledge, skills and equipment to cultivate clam seeds to a mature and marketable product and further that the Investors have received no repayment from the Debtor from clam sales.

8. In its filings with the Court in May of 1996, the Debtor initially included the Aquaculture Investors on Schedule G—Executory Contracts and Unexpired Leases. In addition, the Debtor initially listed the Aquacul-

---

1. Further references to the Bankruptcy Code will be by section number only.

2. 17 C.F.R. Sections 230.501 et seq.

3. 15 U.S.C. Sections 77a et seq.

4. See Debtor's Disclosure Statement at page 5 and Star Fish's Disclosure Statement at page 5.

5. See Exhibit A to Debtor's amended Plan filed January 29, 1997.

ture Investors on Schedule F—Creditors Holding Unsecured Nonpriority Claims. The Aquaculture Investors were described on Schedule F as holding "fixed and liquidated" claims either in an "unknown" amount or in the amount of "0.00" dollars.

9. On January 27, 1997, two days prior to the Hearing, the Debtor amended its Schedules to delete the Aquaculture Investors from Schedules F and G. At the same time, the Debtor filed an amended List of Equity Security Holders describing the Aquaculture Investors as equity security holders of the Debtor.

10. The proposed Plans of both the Debtor and Star Fish [6] provide that the only property to be received by the Aquaculture Investors will be shares of stock in the reorganized Debtor if and when one of the Plans is confirmed by the Court. Counsel stated at the Hearing that the Aquaculture Investors would receive an approximately 25% stock interest in the reorganized Debtor under Star Fish's Plan and an approximately 23% stock interest in the reorganized Debtor under the Debtor's Plan.

11. At the Hearing, all parties stipulated to the admission into evidence of the following documents as representative of the agreements between the Debtor and the Investors:

(A) Private Offering Circular dated August 19, 1994 describing:

ATLANTIC LITTLENECK CLAM-FARMS, INC.

$2,500,000

100 Aquaculture Investment Contracts

$25,000 per Contract

(B) Subscription Agreement signed by the Movant and his wife as "INDIVIDUAL INVESTORS" on November 21, 1994, with the Aquaculture Investment Agreement attached.

(C) Agreement dated as of October 1, 1995 (the "1995 Agreement") executed by the Movant and his wife as "Investors". The 1995 Agreement, among other things, made certain amendments to the Investment Agreements.

## CONCLUSIONS OF LAW

■ The Debtor and the Committee assert that the Investment Agreements do not constitute executory contracts but investment contracts and therefore the Aquaculture Investors are equity interest holders in the Debtor. The United States Supreme Court and the Fourth Circuit Court of Appeals have published opinions that provide guidance to the determination of whether a contribution of money constitutes an incurring of debt or an infusion of capital in the form of equity.

In the seminal "investment contract" case of *Securities and Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court defined an investment contract as follows:

> ... an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.... The respondent companies ... are offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents. They are offering this opportunity to persons who reside in distant localities and who lack the equipment and experience requisite to the cultivation, harvesting and marketing of the citrus products. Such persons have no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment.

*Securities and Exchange Commission v. W.J. Howey Co.*, 328 U.S. at 300, 66 S.Ct. at

**6.** The Court takes judicial notice of the proposed Plans and other documents filed with the Court.

1103. In *Howey*, Florida corporations offered units of a citrus grove development coupled with a contract for cultivating, marketing and remitting the net proceeds to the investor. The corporation planted half of the citrus groves itself and offered the other half to the public "to help us finance additional development." [7] The corporations were given full discretion and authority over the cultivation of the groves and the harvesting and marketing of the crops. All of the produce was pooled by the corporations, and the corporations were accountable only for an allocation of the net profits.

The purchasers of the "units" in the *Howey* case were primarily non-residents of Florida. They were predominantly business and professional people who lacked the knowledge, skill and equipment necessary for the care and cultivation of citrus trees and were attracted by the expectation of substantial profits.[8] In *Howey*, the purchasers of "units" received written land sales contracts and deeds [9] for the purchase of a particular plot constituting a fraction of the citrus grove. Purchasers usually received rights to narrow strips of land arranged so that an acre consists of a row of 48 citrus trees.

The lower courts treated the contracts and deeds as separate transactions involving no more than an ordinary real estate sale and an agreement by the seller corporations to manage the property for the buyers.[10] In reversing the lower courts, the Supreme Court emphasized that, "regardless of the legal terminology in which such contracts are clothed" [11], form should be disregarded for substance and emphasis should be placed upon economic reality.[12] The Supreme Court concluded that the land sales contracts and warranty deeds served as:

... a convenient method of determining the investors' allocable shares of the prof-

its. The resulting transfer of rights in land is purely incidental.

Thus all the elements of a profit-seeking business venture are present here. The investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise. It follows that the arrangements whereby the investors' interests are made manifest involve investment contracts, regardless of the legal terminology in which such contracts are clothed.

*Securities and Exchange Commission v. W.J. Howey Co.*, 328 U.S. at 298–302, 66 S.Ct. at 1103–1104. The Supreme Court further held that the proper test to determine whether the financial relationship falls within the term investment contract "is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. If that test be satisfied, it is immaterial whether the enterprise is speculative or non-speculative or whether there is a sale of property with or without intrinsic value." *Securities and Exchange Commission v. W.J. Howey Co.*, 328 U.S. at 300–302, 66 S.Ct. at 1104.

The facts of the within case are very similar to those in *Howey*. In this case, the Aquaculture Investors for the most part are non-residents of South Carolina and are predominantly business and professional people attracted by the expectation of substantial profits. They do not appear to be people with the knowledge, skill and equipment necessary for the care and cultivation of clams but instead relied upon, and were in fact dependent upon, the knowledge, skill and equipment of the Debtor to raise the purchased clam seeds into a much more valuable product, mature and marketable clams. The Private Offering Circular states that:

7. 328 U.S. at 294–296, 66 S.Ct. at 1101.

8. *Id.* at pages 296–298, 66 S.Ct. at page 1102.

9. In this case the investment was in clams rather than land. The Fourth Circuit has noted, however, that when the *Howey* test is satisfied, as it is with the Investment Agreements, the identity of the underlying commodity involved in the "con-

trivance" is "irrelevant". *Kosnoski v. Bruce*, 669 F.2d 944, 945, 947 n. 3 (4th Cir.1982).

10. *Id.* at pages 296–298, 66 S.Ct. at page 1102.

11. *Id.* at page 300, 66 S.Ct. at page 1104.

12. *Id.* at pages 296–298, 66 S.Ct. at page 1102.

... investors are afforded the opportunity to participate in the clam aquaculture business. . . . [E]ach investor will acquire an initial batch of seed clams and the Company will agree to provide for the care, growing and harvesting of the clams. Upon harvesting, the Company will offer to purchase the clams from the investor at then prevailing market prices. . . . Each investor is also granted the right to acquire an additional four 'batches' of seed clams over the next four years. . . . The price is $25,000 per contract, of which $19,000 is payable upon execution and $6,000 is payable one year later. In addition, the investor will be subject to charges for care, growing and harvesting of clams up to $5,000.

Private Offering Circular at page 1. While the Aquaculture Investors were required to pay some of the costs for the growing and harvesting of the clams, it is reasonable to infer that such costs would be much lower than the real costs of privately raising such a quantity of clams or relocating and hiring other entities to grow and harvest the clams, if such were even possible. The 1995 Agreement, among other things, also states that the Aquaculture Investors "have agreed to participate in a pooling arrangement with respect to their clams. . . ." [13] While there are some factual differences in regards to the marketing of the clams, there are sufficient similar facts so that the analysis of *Howey* seems applicable to the case before the Court.

The Fourth Circuit had the opportunity to apply the *Howey* test in *Kosnoski v. Bruce,* 669 F.2d 944 (4th Cir.1982) in which the Court found that limited partnership interests in an office building were investment contracts.

> The classic test for the determination of what constitutes an "investment contract" was stated in *Securities & Exchange Commission v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). There, the Supreme Court indicated that an investment contract would be found un-

der Federal law where a "scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301, 66 S.Ct. at 1104. The facts of this case square with this definition. The two deals provided for the contribution of at least $585,000 by plaintiff to an enterprise including three other parties. The record also demonstrates that plaintiff was a passive participant in these two ventures. All management responsibilities were delegated to the general partners. Plaintiff was not expected to, nor did he, take part in the running of the two partnerships. We think the District Court was correct in characterizing these investment vehicles as securities.

*Kosnoski v. Bruce,* 669 F.2d at 946, 947. Similar to *Kosnoski,* in this case the Aquaculture Investors also were passive participants with all management responsibilities remaining with the Debtor; in fact, in making this type of investment with the Debtor, the Aquaculture Investors knew or should have known that the Debtor was unique in its ability to grow and harvest these particular clams and thus accomplish the Aquaculture Investors' goal of a substantial profit.

More recently, the Fourth Circuit again had the opportunity to apply the criteria of the *Howey* test.

> To determine whether Lloyd's Plan constitutes an "investment contract" subject to the requirements of the securities laws, we apply the test announced in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In *Howey,* the Supreme Court established that "an investment contract . . . means a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts of [others]." *Id.* at 298–99, 66 S.Ct. at 1102–03. And the Court later instructed that the *Howey* test is to be applied with an eye to "the substance—the economic realities of the transaction—rather than the names that may

**13.** 1995 Agreement at page 1.

have been employed by the parties." *United Hous. Found., Inc. v. Forman,* 421 U.S. 837, 851–52, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975).

*Allen v. Lloyd's of London,* 94 F.3d 923, 930 (4th Cir.1996).

It appears clear that the first and second elements of the *Howey* test have been met in that it is stipulated that the Aquaculture Investors did invest money and the Aquaculture Agreements are very clear that the farming of the subject clams would be a common enterprise between the Aquaculture Investors and the Debtor and one in which the growth and harvest process was ultimately dependent upon the Debtor's operations. As stated in the Findings of Fact, both the Debtor's Disclosure Statement and Star Fish's Disclosure Statement state that the Investment Agreements were used to attract investment and that most of the Investment Agreements were sold to California investors, who are described in both Disclosure Statements as "passive investors".

In looking to the remaining parts of the *Howey* test, the Fourth Circuit has provided additional guidance. The Fourth Circuit examined these final elements in *Teague v. Bakker,* 35 F.3d 978 (4th Cir.1994) and in citing the Supreme Court's *United Housing Foundation v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) decision stated:

> The Supreme Court considered *Howey's* third prong in the context of an offering of interests in real estate in *United Housing Foundation v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). There the Court was faced with the question of "whether shares of stock entitling a purchaser to lease an apartment in . . . a state subsidized and supervised nonprofit housing cooperative . . . are 'securities'." *Id.* at 840, 95 S.Ct. at 2054. The Court answered this question in the negative, explaining:
>
> > The touchstone [of the *Howey* test] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds. . . . In such cases the investor is "attracted solely by the prospects of a return" on his investment. *Howey,* supra, [328 U.S.] at 300 [66 S.Ct. at 1103]. By contrast, when a purchaser is motivated by a desire to use or consume the item purchased—"to occupy the land or to develop it themselves," as the *Howey* Court put it, ibid.—the securities laws do not apply.
>
> *Id.,* 421 U.S. at 852–53, 95 S.Ct. at 2060–61 (citations and footnotes omitted) . . .
>
> *Forman,* we think, makes clear that, for *Howey's* third prong to be satisfied, it must be shown (1) that the opportunity provided to offerees tended to induce purchases by emphasizing the possibility of profits, (2) that the profits are offered in the form of capital appreciation or participation in earnings within the meaning of *Howey* and *Forman,* and (3) that the profits offered would be garnered from the efforts of others.

*Teague v. Bakker,* 35 F.3d at 986. It is clear from the various documents submitted by stipulation into evidence that the Aquaculture Investors were induced by the possibility of a profit and that the profits would be in the form of capital appreciation based upon the future value of the matured clam seeds. While the documents did indicate that the Aquaculture Investors had the option at harvest of taking possession of the clams and market them elsewhere, there was no evidence to indicate that was actually done or even likely. Furthermore, because the Aquaculture Investors were not otherwise in a business which consumed or independently marketed clams, there is no convincing evidence that the investment decision was made with a specific desire to use or consume the clams upon harvest.

Additionally, the Court is satisfied that any profits to be realized by the Aquaculture

Investors would be solely dependent upon the efforts of the Debtor. As stated previously, the Aquaculture Investors did not have the knowledge, skill or equipment to raise the clam seeds to maturity and knew when they made the investment that their profit was dependent upon the Debtor's operations.

Therefore, applying the *Howey* test as defined by the Fourth Circuit and focusing on the core documents at issue,[14] it appears to the Court that these Investment Agreements are investment contracts.

However, even if there were a question as to the application of the *Howey* factors, the direction from *Forman* that the test is to be applied with an eye to the economic realities of the transaction solidifies the Court's view that these Investment Agreements are investment contracts, especially in light of the sophistication of all of the parties involved. As stated in the Private Offering Circular at page 4, the investment contracts were sold "to persons who met 'certain investment sophistication requirements'... persons who can best bear the risk of such an investment."

The Court finds additional support for its conclusion in case law decisions related to the issue of whether funds supplied to a business are, in substance, debt or equity and, consequently, whether reimbursement is to be considered for federal income tax purposes as a loan repayment or a dividend distribution.[15] While different cases utilize different lists of factors, the substance of each analysis is similar. This Court finds that the list of factors set forth in *Estate of Mixon v. U.S.*, 464 F.2d 394 (5th Cir.1972), a tax determination case, is helpful in determining whether the Aquaculture Investors are creditors or equity security holders of the Debtor.

### (1) The Names Given to the Certificates Evidencing the Indebtedness.

■ The thrust of this factor is that the court will look to the type of document used by the parties in considering the debt-equity question. The issuance of a stock certificate indicates an equity contribution; the issuance of a bond, debenture, or note is indicative of a bona fide indebtedness. This case involves neither a stock certificate nor a note. However, South Carolina law provides that equity securities need not be in the form of a stock certificate.[16] Furthermore, it is evident that the documents do not contain any formal, unconditional promise to repay the advance of funds made to the Debtor by the Investors. There is no set provision for unconditional terms of repayment, interest, and consideration, indicating that the advances were, in the words of the *Mixon* court, "equity bound and intended."[17] To the contrary, the documents are replete with warnings that the investments are at substantial risk both because of the natural calamities that may result to clams before maturity and harvest and because of the possibilities that the Debtor may discontinue operations.

---

14. At the commencement of the Hearing, counsel for the Movant expressed his intention to offer into evidence certain other documents and witness testimony. Counsel for the Debtor, Seafood Holdings, and the Committee moved to exclude all evidence extraneous to the Private Offering Circular, the Subscription Agreement with attached Investment Agreement, and the 1995 Agreement. The Court took the motion to exclude under advisement and permitted the Movant to proceed with the introduction of testimony and other documentary evidence. However, a review of the extrinsic evidence submitted by the Movant even without rebuttal evidence or testimony of the Debtor, does not alter the Court's findings.

15. *See, e.g., Estate of Mixon v. United States,* 464 F.2d 394 (5th Cir.1972). *See also Matter of Lar-*

son*, 862 F.2d 112 (7th Cir.1988); *Bauer v. C.I.R.,* 748 F.2d 1365 (9th Cir.1984); *Roth Steel Tube Company v. C.I.R.,* 800 F.2d 625 (6th Cir.1986), cert. denied, 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987).

16. S.C.Code Ann. Section 33–6–260(a).

17. 464 F.2d at page 403. *Cf. South Carolina National Bank v. Darmstadter,* 622 F.Supp. 226, 230 (D.S.C.1985) (loan transactions were not securities where notes issued were for a fixed sum, fixed rate of interest, and fixed due date; notes also included standard default provisions, and there was no reliance on managerial abilities of others or on success of investment for repayment).

### (2) Presence or Absence of a Maturity Date.

■ The presence of a fixed maturity date indicates a fixed obligation to repay, a characteristic of a debt obligation. The absence of a fixed maturity date indicates that repayment was in some way tied to the fortunes of the business, a characteristic of an equity advance. Although the Debtor agrees to purchase from the Aquaculture Investors those clams in "Marketable Condition and of Marketable Size" [18], the Investment Agreements contain no set maturity date. In addition, as stated, the lengthy and explicit "RISK FACTORS" section of the Private Offering Circular emphasizes that repayment of each Investor's investment in the Debtor's operation is purely speculative. Accordingly, this factor suggests that the Investment Agreements are more akin to equity interests than business loans.

### (3) The Source of the Payments.

■ If repayment is possible only out of corporate earnings, the transaction has the appearance of a contribution of equity capital. On the other hand, if repayment is not dependent upon earnings, the transaction reflects a loan to the corporation. In light of the "RISK FACTORS" section of the Private Offering Circular, and the lack of any absolute right of repayment in the Investment Agreements, it appears that repayment to the Aquaculture Investors is directly tied to the success, or lack thereof, of the Debtor's operations. These facts would appear to support an equity characterization of the transaction.

### (4) Right to Enforce Repayment.

■ Again, where there is a definite obligation to repay the advance, the transaction takes on some indicia of a loan. In this case, however, the Investors' source of repayment is dependent on the success of the Debtor's

business. Pursuant to the explicit "RISK FACTORS" section, repayment to the Investors is more a matter of "whether" than "when",[19] making the transaction appear to be more of an equity interest than a standard business loan.

### (5) Participation Increase in Management.

The Aquaculture Investors were not granted any voting power or control of the Debtor's operations under the Investment Agreements. Nonetheless, South Carolina law provides that equity securities need not have voting rights.[20] S.C.Code Ann. Section 33–1–400(22) defines "shares" as "units into which the proprietary interests in a corporation are divided." While the Investors were not granted voting power or control, at least one court has noted that the "proprietary" interests in this statutory definition may consist of one or more of the rights to participate in control, in surplus or profits, or in the distribution of assets. *Stroh v. Blackhawk Holding Corporation,* 48 Ill.2d 471, 272 N.E.2d 1, 4 (1971). In this case the Investors would not be repaid other than from speculative profits of the Debtor's operations, indicating that at least one of the three disjunctive rights characterizing a "proprietary" interest is present. *Id.*

### (6) Subordination.

■ Whether payments by the Aquaculture Investors to the Debtor have a status equal to or inferior to that of regular corporate creditors can bear upon the determination of whether the Investors are creditors or equity interest holders. The Investment Agreements do not address where repayments to Investors would stand on a priority scale. Accordingly, this factor does not assist in the debt-equity determination.

### (7) Intent of the Parties.

There is express language in the investment documents which indicates that it was

---

18. Investment Agreement at page A–3.

19. *Cf. Estate of Mixon,* 464 F.2d at page 406.

20. S.C.Code Ann. Section 33–6–101(c).

not intended that the Investors be given a right to share in the equity or profits of the Debtor. Despite this language, both of the Disclosure Statements and the economic realities of the transaction lead this Court to believe that the Aquaculture Investors are "passive investors" rather than creditors.

### (8) Thin or Adequate Capitalization.

■ Thin capitalization of the business can constitute strong evidence of a capital contribution. The Private Offering Circular specifically addresses this factor:

> Risk Factors. There are significant risks relating to the Company's continuing financial viability and ability to complete the contracts. . . .
>
> The Company has experienced losses from its inception, and its independent accountants have included an explanatory paragraph in their report on its financial statements which indicates the existence of substantial doubt about the Company's ability to continue as a going concern in the absence of significant additional financing.[21]

In addition to the foregoing provisions, the Private Offering Circular contains a separate section under "RISK FACTORS" emphasizing the "Need for Additional Financing." This section states that the Debtor incurred aggregate net losses exceeding $5,000,000 from its organization in 1989 through December 31, 1993, and that the Debtor anticipates net losses for 1994. The section states further that, as of March 31, 1994, the Debtor's cash resources were approximately $538,000,

and that its current liabilities (other than loans from affiliates) exceeded $1,239,000. The section references a commitment for new equity financing of $1,750,000 from one of the Debtor's shareholders and that the Debtor is seeking additional financing. The section concludes by stating, however, that "there can be no assurance that such additional capital will be available."[22]

Despite the substantial financial risks to the Debtor's viability, the Movant executed the Subscription Agreement on November 21, 1994.

### (9) Identity of Interest Between Creditor and Stockholder.

■ If advances are made by stockholders in proportion to their respective stock ownership, an equity capital contribution is indicated. A sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is, however, indicative that the debt is bona fide.[23]

In this case, the Aquaculture Investors were not existing stockholders in the Debtor at the time they purchased the Investment Agreements. Accordingly, this factor is of limited utility in the debt-equity analysis.[24]

### (10) Payment of Interest Only Out of Dividend Money.

There is no provision for payment of interest on the purchase price paid by the Aquaculture Investors. As the Fifth Circuit noted in Estate of Mixon:

> The failure to insist on interest payments ordinarily indicates that the payors [here,

21. Private Offering Circular at pages 3–4.

22. Private Offering Circular at page 5. These stated risks to Investors concerning the Debtor's financial viability proved accurate. The Court takes judicial notice of (1) the Debtor's Summary of Schedules filed in May of 1996 showing total assets of approximately $725,000 and total liabilities approaching $12,000,000 and (2) a business valuation of the Debtor performed by a certified public accountant, and attached to the Debtor's Disclosure Statement filed with the Court, showing the Debtor's negative net worth, as of June 30, 1996, of approximately $16,000,000.

23. Estate of Mixon, 464 F.2d at page 409.

24. The Court does note that repayment to each Investor was dependent upon the success, or lack thereof, of each Investor's clam allocation. As stated previously, the Court also notes that the proposed Plans of both the Debtor and Star Fish, the latter having the stated support of the Movant at least as of the hearing date, treat the Aquaculture Investors as holding, respectively, a 23% and 25% equity position in the reorganized Debtor when and if one of the proposed Plans is confirmed.

the Investors] are not seriously expecting any substantial interest income, but are interested in the future earnings of the corporation or the *increased market value of their interest.*[25]

■ The lack of an express provision for the payment of interest indicates that the monies paid by the Aquaculture Investors to the Debtor were intended as a contribution to equity capital rather than an arms length debt obligation.

### (11) Ability to Obtain Loans From Outside Lending Institutions.

■ If a corporation is able to borrow funds from outside sources at the time the transaction is made, the transaction has the appearance of a bona fide indebtedness. The purpose of this inquiry is to test whether the parties contributing funds to the corporation acted in the same manner toward the corporation as ordinary, reasonable creditors would have acted. If no reasonable creditor would have loaned funds to the corporation at the time of the advance, an inference arises that the advance is more in the nature of an equity interest than a bona fide loan.[26]

This factor is similar to the capitalization factor addressed previously. It is reasonable to assume that ordinary, reasonable creditors either would not have made loans to the Debtor at the time of the offering of the Investment Agreements, or would have protected themselves from the "significant risks relating to the Company's continuing financial viability...."[27] Instead of borrowing from ordinary business lenders, the Debtor sold investment contracts "to persons who met 'certain investment sophistication requirements'... persons who can best bear the risk of such an investment."[28] Accord-

ingly, this factor suggests that the Investment Agreements represent equity interests of the Debtor.

### (12) The Extent to Which the Advance was Used to Acquire Capital Assets.

There is no direct evidence before the Court on this factor.

### (13) The Failure of the Corporation to Repay on the Due Date.

Again, the Investment Agreements do not contain a definite repayment due date. To the contrary, the Private Offering Circular specifically emphasizes that:

Investors should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time.[29]

This message was sufficiently important for the Private Offering Circular to state in a separate section: "... A purchaser of a contract must bear the economic risk of investment in the contract for an indefinite period of time." [30]

Although the documents anticipate that the "grow out" period necessary to raise the clams to market maturity would be approximately 36 months [31], the Investors' ability to receive repayment from harvesting and market sale of the clams was full of specified risks and uncertainties. The lack of a repayment due date suggests that the Investment Agreements constitute equity interests of the Debtor.

### CONCLUSION

As the Seventh Circuit stated in *Matter of Larson,* 862 F.2d 112, 117 (7th Cir.1988):

---

**25.** 464 F.2d at page 409 (citations omitted)(emphasis added). The Fifth Circuit noted further that "a true lender is concerned with interest." *Id.*

**26.** *Estate of Mixon,* 464 F.2d at page 410.

**27.** Private Offering Circular at page 3.

**28.** Private Offering Circular at page 4.

**29.** Private Offering Circular at page 2.

**30.** Private Offering Circular at page 3.

**31.** *See* Private Offering Circular at page 3.

The distinction between a capital investor and a creditor is not that the latter expects repayment while the former does not. It is that the creditor expects repayment regardless of the debtor corporation's success or failure, while the investor expects to make a profit (hoping for a larger profit than the creditor will make in interest) if, as he no doubt devoutly wishes, the company is successful. (emphasis in original)[32]

The Aquaculture Investors, like the transferors in *Larson*, expected to be repaid only if the Debtor operated successfully and provided necessary management and services to the clam seeds. They knew or should have known that the realization of a profit from their investment in clam seeds was entirely dependent upon these successful operations. This indicates that each Investor "acted as a classic capital investor hoping to make a profit, not as a creditor expecting to be repaid regardless of the company's success or failure."[33]

In summary, the factors analyzed above support the conclusion that the Aquaculture Investors were properly identified as "investors" in the documents at issue. Although the investment contracts were not denominated as stock interests, the economic reality is clear that the Aquaculture Investors' expectation of a substantial profit rested entirely on the Debtor's continuing operations. The Bankruptcy Code defines "equity security" to mean a "share in a corporation, whether or not transferable or denominated 'stock', or similar security...."[34] This Court concludes that the Aquaculture Investors are equity security holders[35] of the Debtor and therefore need not further address whether the Aquaculture Agreements are executory contracts or not.

Pursuant to all of the foregoing Findings of Fact and Conclusions of Law, the Court hereby denies the Motion to Compel Debtor to Accept Executory Contracts. As to the alternative request for an Order fixing time for filing proofs of claims, the Court hereby allows the Aquaculture Investors to file proofs of interests (or amend their previously filed proofs of claims) to conform to this ruling pursuant to Rule 3003 of the Federal Rules of Bankruptcy Procedure, within ten (10) days of the entry of this Order.

**AND IT IS SO ORDERED.**

---

**32.** The Seventh Circuit rejected the payors' position that their $1,000,000 transfer to the debtor corporation, by its very size, evidenced a loan: "Certainly investors often contribute large sums of capital to corporations." *Id.* This point also applies in this case. Although numerous Aquaculture Investors contributed total funds to the Debtor in excess of $3,000,000, the size of these transfers in and of itself does not support a finding that the transfers were loans. *Id.*

**33.** 862 F.2d at page 117 (emphasis in original).

**34.** 11 U.S.C. Section 101(16)(A).

**35.** Defined in Section 101(17).